Fulton County Superior Court
***EFILED***TV
Date: 7/2/2021 4:54 PM
Cathelene Robinson, Clerk

IN THE SUPERIOR COURT OF FULTON COUNTY
STATE OF GEORGIA

| | |
|---|---|
| RYAN WINDSOR, CWISS HOLDINGS, LP, a Texas Limited Partnership, AND ALCATRAZ MEDIA, INC., a Delaware For-Profit Corporation. | ) ) ) ) ) |
| Plaintiff, | ) Civil Action File No. __2021CV351475__ |
| v. | ) ) JURY TRIAL DEMANDED |
| CITY INFO EXPERTS, LLC, AND CHARLES THOMAS SCHMIDT, individually, | ) ) ) |
| Defendants. | ) ) |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

Ryan Windsor ("Windsor"), CWISS Holdings, LP ("CWISS") and Alcatraz Media, Inc. ("Alcatraz Media") (collectively "Plaintiffs") file this Complaint for Damages and Equitable relief against City Info Experts, LLC ("City Info") and Charles Thomas Schmidt ("Schmidt") (collectively "Defendants") and shows as follows:

## OVERVIEW OF DEFENDANTS' ACTS

1.

Defendants are an attorney (Schmidt) and a business (City Info) who entered into several related transactions with the sole intent to defraud the Plaintiffs.

2.

Further, the conduct of Schmidt, Schmidt's law firm, and City Info constituted a criminal enterprise in which Schmidt and City Info misrepresented the proposed consideration for the transactions in order to induce Plaintiffs to enter into those transactions. Specifically, City Info promised, as consideration for each of the relevant transactions, to assume and relieve Alcatraz

Media and Windsor of debts to certain creditors.

3.

City Info then intentionally failed to perform its obligations under the transaction agreements. In further pursuit of their criminal enterprise, Schmidt and the Schmidt's law firm offered to represent Plaintiffs in subsequent litigation by creditors against Mr. Windsor, individually, which resulted directly from City Info and Schmidt's intentional breach of the original transaction agreements.

4.

At all times during the representation, Schmidt and Schmidt's law firm counseled and advised Plaintiffs to withhold from and otherwise not disclose the necessary indemnification provisions of the transactions to the opposing creditor parties in their continuing attempts to avoid performing their obligations under the transaction agreements.

5.

City Info, Schmidt, and Schmidt's law firm ultimately created a tornado of confusion by providing self-serving legal advice, furthering the fraudulent scheme against Plaintiffs, and duping opposing litigation parties under the guise of representing Plaintiffs in litigation against creditors.

6.

Ultimately, every act by City Info, Schmidt, and the Schmidt Law Firm was an attempt to induce Plaintiffs into entering into the fraudulent transactions, to further that fraud after the consummation of the transactions, and to avoid any and all obligations under the transaction agreements.

## JURISDICTIONAL ALLEGATIONS

7.

Windsor is an individual domiciled in Austin, Texas who acted as the President/CEO of Alcatraz Media, Inc. and President of CWISS Holdings, LP at all times relevant to this litigation.

8.

Alcatraz Media is a Delaware for-profit corporation with a principal place of business in Fulton County at 8200 Roberts Drive, Ste. 204, Atlanta, Georgia 30350.

9.

CWISS is a Texas Limited Partnership with a principal place of business at 555 E 5th. St. Apt 2811, Austin, Texas 78701.

10.

City Info Experts, LLC is a Texas limited liability company with a principal place of business at 7880 San Felipe St. Ste 210, Houston, TX 77063.

11.

Charles Thomas Schmidt is domiciled in the State of Texas with a place of residence at 2416 Ella Lee Ln., Houston, Texas 77019.

12.

Defendant City Info is subject to personal jurisdiction before this court because it (i) transacts business within this state, within the meaning of O.C.G.A. § 9-10-91(1); and (ii) has committed tortious acts within this State, within the meaning of O.C.G.A. § 9-10-91(2).

13.

Defendant Schmidt is subject to personal jurisdiction before this court because it has committed tortious acts within this State, within the meaning of O.C.G.A. § 9-10-91(2).

14.

This Court has subject matter jurisdiction over all claims asserted in this Complaint.

15.

Pursuant to Ga. Const. art. VI, § 2, ¶¶ IV and VI, venue is therefore proper in Fulton County, Georgia.

## FACTS COMMON TO ALL COUNTS

### The Parties

16.

Alcatraz Media and its affiliates licensed, owned, and/or operated websites that marketed travel-related products and services.

17.

Ryan Windsor is the majority shareholder and President/CEO of Alcatraz Media and President of CWISS.

18.

CWISS is a separately-owned entity that licensed certain intellectual property assets and domain name assets to Alcatraz Media for use in its business.

19.

City Info is a Texas entity that acquired certain assets of Alcatraz Media and CWISS pursuant to two Asset Purchase Agreements.

20.

Schmidt is an attorney licensed in the State of Texas and the majority member or sole member of City Info.  Upon information and belief, Schmidt is the manager of City Info.  As the manager of City Info, Schmidt directed, ratified, or otherwise personally participated in those

actions of City Info which give rise to a substantial part of the events upon which the claims set forth herein are based and which occurred, or had their effects felt, in the State of Georgia.

**The Transactions**

21.

In early 2016, Alcatraz Media and Mr. Windsor began shopping Alcatraz Media to potential purchasers.

22.

Alcatraz Media and Mr. Windsor had identified a potential purchaser, however, they were required to obtain approval from each and every vendor of Alcatraz Media to proceed with the sale.

23.

Schmidt, at that time a vendor of Alcatraz Media, learned of the potential purchase and contacted the offices of Alcatraz Media in Atlanta, Georgia to inquire about purchasing the entity.

24.

Schmidt threatened to hold up the sale of Alcatraz Media to the third-party purchaser if Alcatraz Media did not otherwise consider a sale to him.

25.

Alcatraz Media, Mr. Windsor, and Schmidt thereby began negotiating for the sale and purchase of all or substantially all of the assets of Alcatraz Media and CWISS.

26.

On July 8, 2015, City Info entered into one Asset Purchase Agreement with Alcatraz Media and one Asset Purchase Agreement with CWISS. The agreements are identical in terms

other than the description of the specific assets to be transferred from the seller to buyer. For all intents and purposes the terms of the agreements are identical and collectively referred to as "The Asset Purchase Agreement." When a term is specific to the Alcatraz Media agreement it will be referred to as the "Alcatraz Media Asset Purchase Agreement," a copy of which is attached hereto as Exhibit A. When a term is specific to the CWISS agreement it will be referred to as the "CWISS Asset Purchase Agreement," a copy of which is attached hereto as Exhibit B.

27.

The Recitals of the Asset Purchase Agreement expressly state, "WHEREAS, Seller desires to have Buyer assume responsibility for and to indemnify Seller and its Indemnified Parties (as defined elsewhere herein) with regard to certain liabilities, and Buyer is willing to assume responsibility and indemnify…" See Exhibit A at 1; See Exhibit B at 1.

28.

At the closing, on July 8, 2021, Alcatraz Media sold, transferred, assigned, and conveyed to City Info all of Alcatraz Media's right, title and interest, legal and equitable, in and to the tangible and intangible, real, personal and mixed assets as set forth in Section 2.1 of the Alcatraz Media Asset Purchase Agreement.

29.

At the closing, on July 8, 2021, CWISS sold, transferred, assigned, and conveyed to City Info all of CWISS' right, title and interest, legal and equitable, in and to the tangible and intangible, real, personal and mixed assets as set forth in Section 2.1 of the CWISS Asset Purchase Agreement.

30.

As consideration for the purchase of the relevant assets in the Asset Purchase Agreements, City Info agreed to assume the liabilities of Alcatraz Media and Windsor for, *inter alia,* certain revolving credit accounts with American Express, as well as a debt obligation to the Kennedy Space Center.

31.

As consideration for the purchase of the relevant assets in the Asset Purchase Agreements, City Info agreed to make payments to Alcatraz Media and CWISS.

32.

As consideration for the purchase of the relevant assets in the Asset Purchase Agreements, City Info agreed to employ Ryan Windsor pursuant to the terms of a separate written employment agreement (the "Employment Agreement"). A true and correct copy of the Employment Agreement is attached hereto as Exhibit C.

33.

As a separate item of consideration in the Employment Agreement, City Info agreed to resolve any of Alcatraz Media and Windsor's outstanding debt to American Express, and to defend and indemnify Windsor against any liability, cost or expense that he may owe regarding such debt.

**Defendants' Non-Performance**

34.

City Info tendered the Purchase Price as specified in the respective Asset Purchase Agreements ($23,000.00 and $35,000.00).

35.

Alcatraz Media and CWISS transferred, assigned, and conveyed all right, title and interest to all assets required by the respective Asset Purchase Agreements.

36.

City Info failed to diligently perform and materially breached its obligation to be financially responsible for liabilities and obligations for customers who had not redeemed their tickets or utilized charter services as of the closing date as required in the Asset Purchase Agreements.

37.

City Info failed to diligently perform and materially breached its obligation to assume, resolve, and settle the outstanding debts to American Express as required in the Asset Purchase Agreements.

38.

As of the date of this Complaint, City Info has made no payments to American Express relating to any of the debts set forth in the Asset Purchase Agreements.

39.

City Info failed to diligently perform and materially breached its obligations to Ryan Windsor with regard to the debts to American Express as required in the Asset Purchase Agreements.

40.

City Info failed to diligently perform and has materially breached its obligation to resolve the any debt or other dispute with the Kennedy Space Center as required in the Asset Purchase Agreements.

41.

City Info failed to diligently perform and materially breached its obligations to assume and resolve any liability or debts relating to Alcatraz and/or CWISS's telecommunications and Internet service providers as required by the Asset Purchase Agreements.

42.

City Info failed to diligently perform and materially breached its obligations to assume and resolve any liability or debts relating to leases made by Alcatraz and/or CWISS as required by the Asset Purchase Agreements.

43.

City Info failed to diligently perform and materially breached its obligations to assume and resolve any liability or debts relating to credit card accounts, other than American Express, as required by the Asset Purchase Agreements.

44.

City Info failed to diligently perform and materially breached its obligations to assume and resolve any liability or debts relating to unused vacation pay or other paid time off for employees of Alcatraz Media as required by the Asset Purchase Agreements.

45.

City Info failed to diligently perform and materially breached its obligations to indemnify Ryan Windsor as required by the Employment Agreement.

46.

City Info failed to use its reasonable best efforts to satisfy the above-identified as required by the Asset Purchase Agreements.

**Defendants' Fraud**

47.

At all times during the negotiation and execution of the Asset Purchase Agreements, City Info, by and through Schmidt, made intentionally false statements regarding its intent to perform its obligations pursuant to the Asset Purchase Agreements.

48.

City Info and Schmidt's intended, prior to the execution and closing of the Asset Purchase Agreements, to only perform those obligations that would take place before closing, thereby acquiring the assets of Alcatraz Media and CWISS without performing any post-closing obligations of either Asset Purchase Agreement.

49.

In December 2016, America Express filed suit against Windsor in Travis County, Texas (Civil Case No.: D-1-GN-16-005033 (the "Travis County Litigation")) for the credit card debt that was specifically assumed by City Info as a material term of the Asset Purchase Agreements and the Employment Agreement.

50.

Schmidt and Schmidt's law firm offered to represent and subsequently did represent Windsor in that litigation.

51.

Throughout the Travis County Litigation, Schmidt and Schmidt's law firm advised, counseled, and told Windsor that the indemnification provisions of the Asset Purchase Agreements and Employment Agreement could not be disclosed to American Express.

52.

In responding to discovery from the plaintiff in the Travis County Litigation, Schmidt and Schmidt's law firm advised and counseled Windsor that he should withhold the existence of the Asset Purchase Agreements and Employment Agreement in response to the following requests for production of documents and disclosures:

(a) "Produce copies of any and all documents and/or agreements which you allege relieve you of the obligation to pay Plaintiff in full for any and all charges incurred on the Account(s) that is the subject of the Plaintiff's Original Petition;"

(b) "Any discoverable indemnity and insuring agreements".

53.

Until Windsor retained the undersigned counsel in June 2021, American Express (the plaintiff in the Travis County Litigation) had never received information about either Asset Purchase Agreement, their indemnification provisions, or that Schmidt – their opposing counsel --- was in fact the sole member and/or managing member of City Info.

54.

Schmidt and City Info represented to Windsor at various times, both as Windsor's attorney and as managing member of City Info, that the indemnification provision, specifically, and Asset Purchase Agreement, generally, was not discoverable and could not be disclosed in discovery due to the confidentiality provisions contained therein.

55.

These misrepresentations by Schmidt and City Info were not only bad legal advice by the Schmidt Law Firm but also specifically intended to perpetuate and further the fraud as described in Paragraphs 47 through 54, above.

**Additional Allegations Regarding: Piercing the Corporate Veil**

56.

Schmidt is upon information and belief the sole member and manager of City Info. Effectively, all business decisions, including entering into transactions are held by Schmidt.

57.

Schmidt is also general counsel for City Info.

58.

Based on the above-detailed breaches of the indemnification agreement, City Info, Schmidt, and Schmidt's law firm obliterate any semblance of legal separateness between the entities.

59.

Schmidt has acted as both the managing member of City Info and as attorney to Mr. Windsor at times, despite their diametrically-opposed interests with respect to the debt obligation to American Express.  At no time did Schmidt disclose to Windsor that he was acting on City Info's behalf while representing Windsor.

60.

In fact, of Schmidt and City Info purposely intended to create such confusion so that Windsor would be unaware that any breach of City Info's obligations had occurred.

61.

Schmidt and Schmidt's law firm intentionally give bad legal advice and counsel to Windsor, intentionally failed to disclose the indemnification agreement to third-party creditors during litigation against Windsor, and further attempted to avoid all liability of City Info to

12

Windsor under the guise of providing assistance to him.

62.

By failing to disclose this conflict of interest to Mr. Windsor, failing to identify in whose interests Schmidt is acting, and failing to identify on whose behalf Schmidt is acting, City Info is nothing more than the alter ego of Schmidt.

**Additional Allegations Regarding: Wire Fraud in Furtherance of the Scheme**

63.

In planning and carrying out the fraudulent campaign against Plaintiffs, City Info, Schmidt, and Schmidt's law firm intended to devise and did devise a scheme or artifice to defraud Plaintiffs.

64.

Pursuant to their scheme, City Info, Schmidt, and Schmidt's law firm intended to and did obtain all of the assets of Alcatraz Media, of the assets of CWISS, and further obtained money from the fraudulent obtainment of such assets by means of false or fraudulent pretenses, representations, and promises that Defendants never intended to honor.

65.

During the course of planning and executing such scheme or artifice, Defendants caused to be transmitted by means of wire, radio, or television communication in interstate of foreign commerce writings, signs, signals, pictures, and/or sounds for the purpose of executing such scheme or artifice.

66.

The transmissions included, but were not limited to, various phone calls, text messages, and emails in the negotiation and execution of the Agreement. Likewise, the transmissions

13

continued after Amex brought suit against Mr. Windsor and Schmidt and the Schmidt Law Firm

assumed the representation of Mr. Windsor. Here, the transmissions included, but were not

limited to, subsequent phone calls, texts messages, and court filings during the representation of

Schmidt in the Amex litigation.

67.

In violation of 18 U.S.C. 1343, Defendants have committed wire fraud.

**COUNT I**
**FRAUD**
**(Against City Info)**

68.

Plaintiffs reallege and incorporate by reference the facts and allegations contained in

paragraphs 1 through 67 above as if the same were set forth herein in full.

69.

City Info represented to Plaintiffs that:

(a)  City Info was – both legally and practically – ready, willing, and able to perform under the
     terms of the Asset Purchase Agreement;

(b)  City Info intended to, and would in fact, faithfully perform as required in the Asset Purchase
     Agreement;

(c)  City Info would specifically promptly pay off the Assumed Obligations as required under
     the Asset Purchase Agreement; and

(d)  City Info would abide the duty of good faith and fair dealing inherent as a matter of law in
     every Georgia contract, including the Asset Purchase Agreement.

70.

At all times relevant to City Info's representations described in the immediately

preceding paragraph and elsewhere above, City Info knew their representations and statements to

be both false and material.

71.

In entering into and executing the Asset Purchase Agreement with City Info, Plaintiffs reasonably relied upon the above-described false representations by City Info and were injured as a direct and proximate cause by such reliance.

72.

At all times relevant to City Info's representations described in the immediately preceding paragraph and elsewhere above, City Info intended to mislead and defraud Plaintiffs regarding these material issues.

73.

Specifically, notwithstanding the express terms of the Asset Purchase Agreement and the promises by City Info embodied therein, City Info intended at all pertinent times that:

(a)   City Info would fail and refuse to perform or even meaningfully commence performance as required by the Asset Purchase Agreement;

(b)   City Info would fraudulently own and operate a business using the assets of Alcatraz Media and CWISS without ever performing under the Asset Purchase Agreement;

(c)   City Info would thereafter continue in their failure and refusal to perform any portion of the obligations under the Asset Purchase Agreement;

(d)   City Info would fail and refuse to disclose the terms of the indemnification provision of the Asset Purchase Agreement to any creditor or third party; and

(e)   City Info would forever thereafter avoid any attempt to actually indemnify Windsor from any creditor or otherwise perform under the Asset Purchase Agreement.

74.

City Info's intentional misrepresentations were made knowingly by City Info to deceive Plaintiffs in relation to material facts.  City Info intended that Plaintiffs rely and act upon these material intentional misrepresentations.

75.

As a result of the intentional misrepresentations and fraud of City Info, Plaintiffs have suffered substantial damages in an amount to be proved at trial.

76.

Plaintiffs are entitled to recover compensatory damages, punitive damages, and reasonable attorney fees for the fraud and intentional misconduct of City Info.

**COUNT II**
**FRAUD**
**(Against Schmidt)**

77.

Plaintiffs reallege and incorporate by reference the facts and allegations contained in paragraphs 1 through 67 above as if the same were set forth herein in full.

78.

Schmidt represented to Plaintiffs that:

(a)   City Info was – both legally and practically – ready, willing, and able to perform under the terms of the Asset Purchase Agreement;

(b)   City Info intended to, and would in fact, faithfully perform as required in the Asset Purchase Agreement;

(c)   City Info would specifically promptly pay off the Assumed Obligations as required under the Asset Purchase Agreement; and

(d)   City Info would abide the duty of good faith and fair dealing inherent as a matter of law in every Georgia contract, including the Asset Purchase Agreement.

79.

At all times relevant to Schmidt's representations described in the immediately preceding paragraph and elsewhere above, Schmidt knew their representations and statements to be both false and material.

16

80.

In entering into and executing the Asset Purchase Agreements, Plaintiffs reasonably relied upon the above-described false representations by Schmidt and were injured as a direct and proximate cause by such reliance.

81.

At all times relevant to Schmidt's representations described in the immediately preceding paragraph and elsewhere above, Schmidt intended to mislead and defraud Plaintiffs regarding these material issues.

82.

Specifically, notwithstanding the express terms of the Asset Purchase Agreement and the promises by Schmidt embodied therein, Schmidt intended at all pertinent times that:

(a) City Info would fail and refuse to perform or even meaningfully commence performance as required by the Asset Purchase Agreement;

(b) City Info would fraudulently own and operate a business using the assets of Alcatraz Media and CWISS without ever performing under the Asset Purchase Agreement;

(c) City Info would thereafter continue in their failure and refusal to perform any portion of the obligations under the Asset Purchase Agreement;

(d) City Info would fail and refuse to disclose the terms of the indemnification provision of the Asset Purchase Agreement to any creditor or third party; and

(e) City Info would forever thereafter avoid any attempt to actually indemnify Windsor from any creditor or otherwise perform under the Asset Purchase Agreement.

83.

Schmidt's intentional misrepresentations were made knowingly by Schmidt to deceive Plaintiffs in relation to material facts.  Schmidt intended that Plaintiffs rely and act upon these material intentional misrepresentations.

84.

As a result of the intentional misrepresentations and fraud of Schmidt, Plaintiffs have suffered substantial damages in an amount to be proved at trial.

85.

Plaintiffs are entitled to recover compensatory damages, punitive damages, and reasonable attorney fees for the fraud and intentional misconduct of Schmidt.

**COUNT III**
**BREACH OF CONTRACT**
**(Alcatraz Media Against City Info)**

86.

Plaintiffs reallege and incorporate by reference the facts and allegations contained in paragraphs 1 through 67 of this Complaint as though set forth in full.

87.

City Info was obligated by the Alcatraz Media Asset Purchase Agreement to perform the obligations set forth therein.

88.

City Info materially breached the Alcatraz Media Asset Purchase Agreement by refusing to perform its obligations.

89.

City Info's breach of the Alcatraz Media Asset Purchase Agreement directly and proximately caused economic injury to Alcatraz Media.

90.

Alcatraz Media has been injured as a result of Defendants material breach in an amount to be proved at trial.

18

## COUNT IV
## BREACH OF CONTRACT
## (CWISS Against City Info)

### 91.

Plaintiffs reallege and incorporate by reference the facts and allegations contained in paragraphs 1 through 67 of this Complaint as though set forth in full.

### 92.

City Info was obligated by the CWISS Asset Purchase Agreement to perform the obligations set forth therein.

### 93.

City Info materially breached the CWISS Asset Purchase Agreement by refusing to perform its obligations.

### 94.

City Info's breach of the CWISS Asset Purchase Agreement directly and proximately caused economic injury to CWISS.

### 95.

CWISS has been injured as a result of City Info's material breach in an amount to be proved at trial.

## COUNT V
## BREACH OF CONTRACT
## (Windsor Against City Info)

### 96.

Plaintiffs reallege and incorporate by reference the facts and allegations contained in paragraphs 1 through 67 of this Complaint as though set forth in full.

97.

City Info was obligated by both Asset Purchase Agreements to perform the obligations set forth therein.

98.

Windsor was a third-party beneficiary of both Asset Purchase Agreements as expressly sated in paragraph 2.3(a)(ii).

99.

City Info materially breached both Asset Purchase Agreement by refusing to perform its obligations.

100.

City Info's breach of both Asset Purchase Agreements directly and proximately caused economic injury to Windsor.

101.

Windsor has been injured as a result of City Info's material breach in an amount to be proved at trial.

**COUNT VI**
**BREACH OF CONTRACT**
**(Windsor Against City Info)**

102.

Plaintiffs reallege and incorporate by reference the facts and allegations contained in paragraphs 1 through 67 of this Complaint as though set forth in full.

103.

City Info was obligated by under the Ryan Windsor Employment Agreement to perform the obligations set forth therein.

104.

City Info materially breached the Ryan Windsor Employment Agreement by refusing to

perform its obligations.

105.

City Info's breach of the Ryan Windsor Employment Agreement directly and

proximately caused economic injury to Windsor.

106.

Windsor has been injured as a result of City Info's material breach in an amount to be

proved at trial.

## COUNT VII
## PIERCING THE CORPORATE VEIL

107.

Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1

through 67 above as if the same were set forth herein in full.

108.

Upon information and belief, Schmidt is the sole member and/or managing member of

City Info.

109.

As the sole member and manager of City Info, by and through the acts and/or omissions

of Schmidt, all separateness of legal entities has been disregarded by Schmidt acting at times as

managing member of City Info and at times as an attorney appearing to represent the interests of

Alcatraz Media, CWISS, and Windsor despite actually acting only in the best interests of City

Info and Schmidt, individually.

21

110.

Defendant City Info, by and through the acts and/or omissions of Schmidt has overextended its privileges in the use of a corporate entity in order to defeat justice and evade the obligations assumed as part of the Asset Purchase Agreement.

111.

At all times relevant hereto, Schmidt has disregarded the entity structure of City Info such that City Info was a mere instrumentality for the transaction of Schmidt's personal affairs.

112.

City Info has failed to maintain the corporate dignity of its entity status and improperly used the rights and assets gained in the Asset Purchase Agreement for the personal gain of Schmidt.

113.

Upon information and belief, there is a unity of interest between City Info and Schmidt such that the separate personality of City Info and Schmidt no longer exists.

114.

Allowing Schmidt to treat City Info as a separate entity would promote injustice and protect fraud.

115.

City Info should be deemed the alter ego of Schmidt.

116.

The interests of justice can only be served by piercing the corporate veil of City Info and finding both City Info and Schmidt liable to Plaintiffs for the amount of all damages to be determined by a jury.

## COUNT VII
## FEDERAL CIVIL RICO VIOLATIONS
### (Against City Info and Schmidt)

117.

Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 above as if the same were set forth herein in full.

118.

18 U.S.C. § 1964 creates a private cause of action for persons and entities injured by violations of 18 U.S.C. § 1962 (the federal Racketeer Influenced & Corrupt Organizations Act).

119.

Defendants' wire fraud (18 U.S.C. § 1341) detailed above constitutes "racketeering activity" as that term is defined in 18 U.S.C. § 1961.

120.

Defendants carry out these illegal activities to conduct and operate their "enterprise" (i.e., their "Indemnification fraud" scheme and activities described in this Complaint).

121.

Defendants' scams and schemes detailed above constitute a pattern of racketeering activity, as required by 18 U.S.C. § 1961.  This pattern exists in relation to the various instances of fraud against Plaintiffs detailed above.

122.

In violation of 18 U.S.C. § 1962(a), Defendants have, through the pattern of racketeering activity described above and through the income derived therefrom, used and/or invested such income and its proceeds to acquire, establish, and operate an enterprise engaged in and affecting interstate and foreign commerce.

123.

In violation of 18 U.S.C. § 1962(b), Defendants have, through the pattern of racketeering activity described above and through the proceeds derived therefrom, acquired and/or maintained, directly or indirectly, an interest in and/or control of an enterprise engaged in and affecting interstate and foreign commerce.

124.

In violation of 18 U.S.C. § 1962(c), Defendants have, through a pattern of racketeering activity, conducted and participated in, directly or indirectly, an enterprise engaged in and affecting interstate and foreign commerce.

125.

In violation of 18 U.S.C. § 1962(d), Defendants have conspired and/or endeavored to violate the provisions of 18 U.S.C. §§ 1962 (a), (b), and (c).

126.

Pursuant to 18 U.S.C. § 1964, Defendants are liable to Plaintiffs for three times Plaintiffs' actual damages, punitive damages, attorney fees, investigative costs, and all other costs associated with or necessitated by the present litigation.

**COUNT IX**
**GEORGIA CIVIL RICO VIOLATIONS**
**(Against City Info and Schmidt)**

127.

Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 above as if the same were set forth herein in full.

128.

O.C.G.A. § 16-14-6(b) creates a private cause of action for persons and entities injured

by violations of O.C.G.A. 16-14-4 (Georgia's "RICO" or Racketeer Influenced & Corrupt Organizations Act).

129.

Defendants' wire fraud (18 U.S.C. § 1341) detailed above constitutes "racketeering activity" as that term is defined in O.C.G.A. § 16-14-3(5).

130.

These acts constitute a pattern of racketeering activity, as required by O.C.G.A. § 16-14-3(4), in relation to Plaintiffs.

131.

In violation of O.C.G.A. § 16-14-4(a), Defendants have, through the pattern of racketeering activity described above and through the proceeds derived therefrom, acquired and/or maintained, directly or indirectly, an interest in and/or control of an enterprise, real property, and/or personal property, including, but not limited to, money.

132.

In violation of O.C.G.A. § 16-14-4(b), Defendants have, through a pattern of racketeering activity, conducted and participated in, directly or indirectly, an enterprise.

133.

In violation of O.C.G.A. § 16-14-4(c), Defendants have conspired and/or endeavored to violate the provisions of § 16-14-4(a) and (b).

134.

Pursuant to O.C.G.A. § 16-14-6(c), Defendants are liable to Plaintiffs for three times Plaintiffs' actual damages, punitive damages, attorney fees, investigative costs, and all other costs associated with or necessitated by the present litigation.

## COUNT X
## ATTORNEY FEES PURSUANT TO O.C.G.A. § 13-6-11
### (Against City Info and Schmidt)

135.

Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 above as if the same were set forth herein in full.

136.

In relation to their wrongful acts described above and to each and every count set forth above, Defendants have acted in bad faith and have caused Plaintiffs unnecessary trouble and expense. As detailed above, Defendants intentionally and in bad faith engaged in illegal conduct they specifically intended would harm Plaintiffs.

137.

Pursuant to O.C.G.A. § 13-6-11, Plaintiffs are entitled to recover all expenses and fees (including the reasonable attorney fees expended herein by Plaintiffs) arising from Defendants' bad faith acts and omissions.

138.

Plaintiffs are also entitled to recover prejudgment interest on their costs and fee-related damages.

## COUNT XI
## PUNITIVE DAMAGES PURSUANT TO O.C.G.A. § 51-12-5.1(f)
### (Against City Info and Schmidt)

139.

Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 67 above as if the same were set forth herein in full.

140.

Each Defendant is an "active tort-feasor" as that term is used in O.C.G.A. § 51-12-5.1(f).

141.

In relation to each and every wrongful act described herein, Defendants acted with the specific intent to cause harm to Plaintiffs.

142.

In relation to each and every wrongful act described herein, Defendants' actions showed willful misconduct.

143.

In relation to each and every wrongful act described herein, Defendants' actions showed malice.

144.

In relation to each and every wrongful act described herein, Defendants' actions showed fraud.

145.

In relation to each and every wrongful act described herein, Defendants' actions showed wantonness.

146.

In relation to each and every wrongful act described herein, Defendants' actions showed oppression.

147.

In relation to each and every wrongful act described herein, Defendants' actions showed an entire want of care.

148.

In relation to each and every wrongful act described herein, Defendants' actions showed a conscious indifference to the consequences of those acts.

149.

Given the egregious and intentional nature of Defendants' conduct, Plaintiffs are entitled to an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1(f) to punish and penalize Defendants, to deter Defendants from similar future misconduct, and to deter other persons and entities similarly situated to Defendants from engaging in similar future misconduct.

150.

Plaintiffs are therefore entitled to an award of punitive damages in an amount not less than fifty thousand dollars ($50,000) pursuant to O.C.G.A. § 51-12-5.1(f).

151.

In the alternative, should the trier of fact somehow determine – despite the mountain of evidence regarding the willful and intentional nature of Defendants' wrongful acts – that Defendants did not act with the specific intent to harm Plaintiffs, then Plaintiffs are still entitled to an award of punitive damages in the amount of fifty thousand dollars ($50,000.00) pursuant to O.C.G.A. § 51-12-5.1(g).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment against Defendants that includes:

(a)     Special and general damages in an amount to be proven at trial;

(b)     Punitive and exemplary damages in an amount to be proven at trial, but in no event less than fifty thousand dollars ($50,000.00);

(c)     Plaintiffs' attorney fees and expenses incurred in the present matter in an amount to be

28

proved at trial pursuant to statutory law or Paragraph 10.16 of the Asset Purchase

Agreement;

(d)     The trebling of all damages pursuant to Plaintiffs' RICO-related claims; and

(e)     Such other and further relief as this Court deems just and proper.

                                            **WELLBORN & WALLACE, LLC**

1218 Menlo Dr. NW, Suite E                  /s/  Samuel A. Mullman
Atlanta, Georgia 30318                      Paul F. Wellborn III
                                            Georgia Bar No. 746720
Phone:   (404) 352-3990                     Kelly O. Wallace
Fax:     (404) 352-3995                     Georgia Bar No. 734166
E-mail:  pete@wellbornlaw.com               Samuel A. Mullman
         kelly@wellbornlaw.com              Georgia Bar No. 456630
         sam@wellbornlaw.com

                                            *Attorneys for Ryan Windsor and Alcatraz Media,*
                                            *Inc.*

29

EXHIBIT A

## ASSET PURCHASE AGREEMENT

This AGREEMENT (this "Agreement") is dated as of <u>July 8, 2015</u> by and between Alcatraz Media, Inc. ("Alcatraz") and City Info Experts, LLC ("Buyer").

### RECITALS:

Whereas, Alcatraz and its Affiliates (as defined elsewhere herein, collectively ("Seller")) licenses, owns and/or operates websites that market tour products, software to operate those websites and to manage the business, has contracts with suppliers, and maintains a customer database (collectively, the "Business"); and

Whereas, Buyer desires to acquire the Sale Assets (as defined elsewhere herein), and Seller is willing to convey such assets to Buyer, per the transaction specified in this Agreement;

Whereas, Seller desires to have Buyer assume responsibility for and to indemnify Seller and its Indemnified Parties (as defined elsewhere herein) with regard to certain liabilities, and Buyer is willing to assume responsibility and indemnify;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, Seller and Buyer hereby agree as follows:

### ARTICLE I

### TERMINOLOGY

1.1     Affiliates. The list of entities appearing on *Exhibit A* to this Agreement that are owned or controlled by either Alcatraz or the owners of Alcatraz, each of which has been actively engaged in operation of websites that market tour products software to operate those websites and to manage the business, has contracts with suppliers, and maintains a customer database.

1.2     Assumed Obligations. Such term shall have the meaning defined in Section 2.3.

1.3     Business Day. Any calendar day, excluding Saturdays and Sundays, on which federally chartered banks are regularly open for business.

1.4     Buyer's Threshold Limitation. As provided in Section 9.3(b), the threshold dollar amount for the aggregate of claims, liabilities, damages, losses, costs and expenses that must be incurred by Buyer before Seller shall be obligated to indemnify Buyer. The Buyer's Threshold Limitation shall be equal to five hundred thousand Dollars ($500,000).

1.5     Closing. The closing with respect to the transactions contemplated by this Agreement.

1

1.6    Closing Date.  July 8, 2015.

1.7    Documents. This Agreement and all Exhibits and Schedules hereto, the Asset Purchase Agreement between Buyer and Cwiss Holdings, LLC, and each other agreement, certificate, or instrument delivered pursuant to or in connection with this Agreement, including amendments thereto that are expressly permitted under the terms of this Agreement.

1.8    Excluded Assets.  Such term shall have the meaning defined in Section 2.2.

1.9    Indemnified Party.  Any party described in Section  9.3 or Section  9.4 against which any claim or liability may be asserted by a third party which would give rise to a claim for indemnification under the provisions of this Agreement by such party.

1.10    Indemnifying Party. The party to the Agreement  (not the Indemnified Party) that, in the event of a claim or liability asserted by a third party against the Indemnified Party which would give rise to a claim for indemnification under the provisions of this Agreement, is obligated to indemnify and hold harmless the Indemnified Party to the extent expressly provided in this Agreement.

1.11    Liens. Any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, lien, lease or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, affecting any Sale Assets, including any written or oral agreement to give or grant any of the foregoing, any conditional sale or other title retention agreement, and the filing of or agreement to give any financing statement with respect to any Sale Assets under the Uniform Commercial Code or comparable law of any jurisdiction.

1.12    Material Adverse Condition. A condition, event or circumstance which would materially restrict, limit, increase the cost or burden of or otherwise materially adversely affect or materially impair the right to the ownership, use, control, enjoyment or operation of the Sale Assets or the proceeds therefrom.

1.13    OSHA Laws. The Occupational Safety and Health Act of 1970, as amended, and all other federal, state or local laws or ordinances, including orders, rules and regulations thereunder, regulating or otherwise affecting health and safety of the workplace.

1.14    Permitted Lien. For purposes hereof, "Permitted Lien" shall mean (i) statutory liens for taxes not due and payable or, that are being contested in good faith by appropriate proceedings; (ii) mechanics, materialmen's, caniers', warehousemen's, landlords' or other similar liens in the ordinary course of business for sums not yet due or which are being contested in good faith by appropriate proceedings; (iii) liens or mortgages that will be released at Closing; and/or (iv) a Lien securing only an Assumed Obligation.

1.15    Person. Any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivisions thereof.

2

1.16    Purchase Price. The consideration to be paid by Buyer to Seller for purchase of the Sale Assets. The Purchase Price is the sum of the Assumed Amex Liability, the Assumed General Liabilities, the Assumed Deferred Revenues, and the Cash Purchase Price.

1.17    Sale Assets. All of the tangible and intangible assets applicable to the Business to be transferred by Seller to Buyer as set forth in Section 2.1.

1.18    Seller's Threshold Limitation.   As provided in Section 9.4(b), the threshold dollar amount for the aggregate of claims, liabilities, damages, losses, costs and expenses that must be incurred by Seller before Buyer shall be obligated to indemnify Seller.   The Seller's Threshold Limitation shall be equal to One Thousand Dollars ($1,000).

1.19    Tangible Personal Property. The personal property described in Section 2.l(a).

ARTICLE II

PURCHASE AND SALE

2.1    Sale Assets. On the Closing Date, Seller will sell, transfer, assign and convey to Buyer, and Buyer will purchase from Seller, free and clear of all Liens, except Permitted Liens, all of Seller's right, title and interest, legal and equitable, in and to the tangible and intangible, real, personal and mixed assets (except Excluded Assets) set forth below:

(a)    Tangible Personal Property. All equipment, computers, furniture, supplies, and other tangible personal property maintained by Seller, described on Schedule 2.1(a), together with such modifications , replacements, and improvements, made thereto;

(b)    Supplier Agreements. Any and all agreements and arrangements, including any renewals, extensions, amendments or modifications of the same, between Seller and third-party suppliers of tours and attractions products and services, including (without limitation) those listed on Schedule 2.1(b) made in the ordinary course of Seller's operation of the Business and/or pertaining to Sale Assets;

(c)    Licenses and Permits. All assignable or transferable governmental permits, licenses and authorizations (and any renewals, extensions, amendments or modifications thereof) now held by Seller to the extent such other permits, licenses and authorizations pertain to or are used exclusively in the operation of the Business and/or pertain to the Sale Assets;

(d)    Records. True and complete copies of all business and corporate records of the Seller involving the operation of the Business in its ordinary course, specifically including financial information, corporate information, contracts with third parties, invoices, notes, emails, and other paper and electronic information;

(e)    Domain Names. The identified domain names included on Schedule 2.1(e), including any trademark, copyright, and other rights associated with the domain name

3

itself and all Internet traffic to the domain name;

    (f)    Websites. All website code, content, page layouts, templates, content management system data, graphics, databases, data, forms, scripts, and any other code, information or content associated with websites operated by the Seller on the Domain Names;

    (g)    Trademarks and Intellectual Property. All trade names, trademarks, logos and like intellectual property rights, registered or otherwise, as well as all copyrights, code, knowledge, trade secrets, operations plans, website marketing strategies, and other intellectual property with regard to the Sale Assets described on Schedule 2.1(g) as developed by and either owned by Seller or licensed to Seller by Cwiss;

    (h)    Customer Database. All contact and other information contained in the database of past customers of Seller, including all rights in and to such data;

    (i)    Software. All rights in and to all software maintained by the Seller, including the software identified in Schedule 2.1(i), and including, but not limited to the code, licenses, modifications, data, and other components of the Software; and

    (j)    Facility Lease. That certain agreement by and between Alcatraz and/or its Affiliates and the landlord of the property being leased to them that is located at 8200 Roberts Drive, Suite 205, Atlanta, Georgia 30350.

2.2    Excluded Assets. Notwithstanding any provision of this Agreement to the contrary, Seller shall not transfer, convey or assign to Buyer, but shall retain all of its right, title and interest in and to, the following assets owned or held by it on the Closing Date ("Excluded Assets"):

    (a)    Any and all cash, cash equivalents, cash deposits to secure contract obligations, all inter-company receivables from any affiliate of Seller and all other accounts receivable, bank deposits and securities held by Seller in respect of the Sale Assets at the Closing Date.

    (b)    Any and all claims of Seller with respect to transactions prior to the Closing including, without limitation, claims for tax refunds.

    (c)    All prepaid expenses.

    (d)    All contracts of insurance and claims against insurers.

    (e)    All employee benefit plans and the assets thereof and all employment contracts

    (f)    All others assets (i.e., tangible personal property, records, documents, intellectual property, domain names, and etc. not included with the Sale Assets or not owned by the Sellers and used with the Business.

2.3     Assumption of Liabilities.

  (a)     At the Closing, Buyer shall assume and agrees to diligently perform, without duplication of Seller's performance, and be financially responsible for the following liabilities and obligations of Seller (the "Assumed  Obligations"):

   (i)     Liabilities and obligations for tours, attractions, and charters for customers who have not redeemed their tickets or utilized charter services as of the Closing Date, net of any payments received from said customers after the Closing Date, up to a maximum of $500,000.00;

   (ii)     The liability and obligations to for amounts, fees, charges and/or interest incurred on the following American Express cards owned and/or used by Sellers or their owners, up to a limit of $850,000.00 plus whatever additional interest, fees, charges and/or amounts (if any) that may become owed or due as a result of the Buyer's timely handling of this Assumed Obligation after the Closing Date (the "Assumed Amex Liability"):



    (a) **AMEX  Black  Card** – ███████76009, expires ██████ – CVV ██;
    (b) **AMEX Platinum Card** – #██████51001, expires unknown – CVV ████ and
    (c) **AMEX Blue Card** – ██████52001, expires ██████ – CVV ████

   (iii)     The obligations of Ryan Windsor to guaranty Seller's obligations and liability to American Express.

   (iv)     In the event and to the extent that the Assumed Amex Liability is less than $850,000.00, Buyers shall assume the liability for the AMEX Express Card - ████ ████61007, expires ██████ – CVV ████ and/or reimburse Barbara Windsor for amounts owing on that account as of the Closing Date for which she makes payment after the Closing Date.

   (v)     The liabilities and obligations of Sellers arising from or relating to agreement, arrangements, disputes and/or obligations with, to or for Kennedy Space Center and/or its affiliated businesses (including, without limitation, any fees, amounts, costs and interests that may be due), up to a limit of $97,500.00 (See Schedule 3.7(ii)).

   (vi)     The liabilities, debts and obligations of Sellers arising from or relating to the fee, amounts, costs and/or interest payable to its telecommunications and/or Internet service providers, up to a limit of $15,000.00

   (vii)     The liabilities, debts and obligations of Sellers arising from or relating to the Facility Lease, including the fees, amounts, costs and/or interest payable to the

landlord arising from or relating to the Facility Lease up to a limit of $11,000.00 for such amounts payable.

(viii)   Assumption of $50,000.00 in credit card liabilities, other than the American Express identified above, for which Seller is liable.

(ix)   All liabilities for unused vacation pay or other paid time off for employees of Alcatraz Media, Inc., up to a maximum amount of $7500.00.

(x)   The obligations, if any, specifically listed in Schedule 2.3.

(b) Except for the Assumed Obligations, Buyer shall not assume or in any manner be liable for any debts, liens, charges, claims, encumbrances, duties, responsibilities, obligations or liabilities of Seller of any kind or nature, whether express or implied, known or unknown, contingent or absolute, including, without limitation, any liabilities to or in connection with (i) Seller's employees whether arising in connection with the transaction contemplated hereunder or otherwise, or (ii) any actions, suits, claims, investigations or administrative, arbitration or other proceedings pending or threatened against Seller or any existing or pending orders, judgments or decrees of any court or governmental agency affecting Seller or any of the Sale Assets.

2.4   Payments of Purchase Price.  At the Closing, and in addition to the Assumed Obligations, Buyer shall pay the Purchase Price as follows:

(a)   By check, which was delivered to Seller on July 1, 2015, the amount of Twenty-three Thousand Dollars ($23,000);

(b)   Delivery of a promissory note to Rod Smith in the amount of $50,000.00 to bear interest at 8%, in payment of salary and wages owed to Mr. Smith, a copy of which is attached as *Exhibit B*; and

(c)   Delivery of a promissory note to Barbara Windsor in the amount of $50,000.00 to bear interest at 8%, in payment of salary and wages owed to Ms. Windsor, a copy of which is attached as *Exhibit B*; and

(d)   Upon the Closing of this Agreement with Seller, Ryan Windsor shall be issued 3,800 Membership Interests in Buyer.  Said Membership Interests shall be fully vested and unencumbered as of the Closing Date, but shall bear the restrictions limiting sale pursuant to the laws of the United States and the several states.

2.5   Allocation of the Purchase Price. Buyer and Seller will use reasonable good faith efforts to agree upon an allocation of the Purchase Price within 30 days of the Closing Date. Buyer and Seller shall use any such allocation for all reporting purposes in connection with federal, state and local income and, to the extent permitted under applicable law, franchise taxes. Buyer and Seller agree to report any such allocation to the Internal Revenue Service in the form required by Treasury Regulation § 1.1060-1T.

2.6   Affiliates as Sellers.

(a)     Each Affiliate hereby acknowledges, agrees and confirms that, by its execution of this Agreement and by reason of its interest in one or more of the Sale Assets to be sold by Seller to Buyer hereunder, shall be deemed to be a party to this Agreement and hereby adopts, ratifies and agrees to be bound by all of the applicable terms, provisions and conditions contained herein as Seller.

(b)     Each Affiliate, and Alcatraz, hereby irrevocably constitutes and appoints Ryan Windsor its true and lawful attorney-in-fact, with full power of substitution, in its name, place and stead, to execute, acknowledge, deliver, swear to, file, and record such documents, certificates or agreements as may be necessary or appropriate to carry out the.  The appointment of Ryan Windsor as its attorney-in-fact shall be deemed to be a power coupled with an interest and irrevocable, and shall survive the bankruptcy, death, incompetence or dissolution of each Affiliate and/or Alcatraz.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as of the Closing Date as follows:

3.1     Organization and Good Standing. Alcatraz is a corporation duly organized and validly existing in the State of Delaware and is authorized to conduct business in the State of Georgia and each and every jurisdiction where Alcatraz conducts business. Seller has all requisite power to own, license, operate and/or lease its properties and carry on its business as it is now being conducted and as the same will be conducted until the Closing.

3.2     Authorization and Binding Effect of Documents. Seller's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents, and the consummation by Seller of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary action on the part of Seller, and no other proceedings on the part of the Seller are necessary to authorize and approve this Agreement. As of the date hereof, the director or managing member of Seller has determined that the transaction contemplated by this Agreement is advisable and in the best interest of its shareholders or members. Seller has the power and authority to execute, deliver and perform its obligations under this Agreement and each of the other Documents and to consummate the transactions hereby and thereby contemplated. This Agreement and each of the other Documents have been, or at or prior to the Closing will be, duly executed by Seller. The Documents, when executed and delivered by the parties hereto, will constitute legal and valid obligations of Seller enforceable against it in accordance with their terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights or remedies generally, and except as may be limited by general principles of equity.

3.3     Absence of Conflicts. The execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents by Seller, and the consummation of the transactions contemplated hereby and thereby:

7

(a)     do not in any material respect (with or without the giving of notice or the passage of time or both) violate, or result in the creation of any Lien other than a Permitted Lien, on any of the Sale Assets under any provision of law, rule or regulation or any order, judgment, injunction, decree or ruling applicable to Seller;

(b)     do not (with or without the giving of notice or the passage of time or both) conflict with or result in a breach or termination of, or constitute a default or give rise to a right of termination or acceleration under the articles of formation or incorporation or bylaws of Seller; or

(c)     do not, pursuant to any lease, agreement, commitment or other instrument which Seller is a party to, or bound by, or by which any of the Sale Assets may be bound, result in the creation of any Lien, other than a Permitted Lien, upon any of the Sale Assets.

3.4     Governmental Consents and Consents of Third Parties.  The execution and delivery of, and the performance of Seller's obligations under, this Agreement and each of the other Documents by Seller, and the consummation by Seller of the transactions contemplated hereby and thereby, do not require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration of filing with, any court or public agency or governmental body or other authority, or the consent of any Person under any agreement, arrangement or commitment of a nature to which Seller is a party or by which it is bound or by which the Sale Assets are bound or to which they are subject to, the failure of which to obtain would constitute a Material Adverse Condition on the Sale Assets.

3.5     Tangible Personal Property.  Except for supplies and other incidental items which in the aggregate are not of material value, the list of Tangible Personal Property (described on Schedule 2.1(a)) includes substantially all of the items of tangible personal property used to a material extent in the operation of the Sale Assets in the manner in which such assets are now operated.  In addition, except to the extent that any defect would not constitute a Material Adverse Condition on the Sale Assets:

(a)     Seller has, or will have as of the Closing Date, good, marketable and valid title to or a license of all of the items of Tangible Personal Property free and clear of all Liens except Permitted Liens, and including the right to transfer same.

(b)     The Tangible Personal Property used to a material extent in the operation of the Sale Assets in the manner in which they are now operated, has been maintained in accordance with industry practices and is in good operating condition subject only to ordinary wear and tear, does not require any repairs other than routine maintenance, and is available for immediate use in the operation of the Sale Assets.

3.6     Domain Names. Seller is the licensee of the domain names listed on Schedule 2.1(e), and except as set forth on such Schedule, (i) the domain names are valid, in good standing and in full force and effect to the actual knowledge of Seller; (ii) no application, action or proceeding is pending, or, to Seller's actual knowledge is threatened, which may result in the revocation, modification, non-renewal or suspension of any of the domain names, the denial of

8

any pending applications, the issuance of any cease and desist order or the imposition of any fines, forfeitures or other administrative actions by any party with respect to the domain names or its operation; (iii) Seller has complied in all material respects with all requirements to update its contact and other information with the domain registrar with respect to the domain names, and all such reports, applications and documents are complete and correct in all material respects; (iv) to Seller's actual knowledge, there are no matters, which could reasonably be expected to result in the suspension, revocation, cancellation, modification of or the refusal to renew any of the domain names.

3.7    Litigation. Except as set forth on Schedule 3.7, (A) there are no actions, suits, claims, investigations or administrative, arbitration or other proceedings pending or to the actual knowledge of Seller threatened against Seller or any affiliate of Seller which would, individually or in the aggregate if adversely determined, be a Material Adverse Condition on the Sale Assets, or which would give any third party the right to enjoin the transactions contemplated by this Agreement. There are no existing or pending orders, judgments or decrees of any court or governmental agency affecting Seller or any of the Sale Assets which would materially adversely affect the Sale Assets.

3.8    Labor Matters.

(a)    Seller is not a party to any collective bargaining agreement, and there is no collective bargaining agreement that determines the terms and conditions of employment of any employees of Seller.

(b)    With respect to the operation of Seller's business, there is no labor strike, dispute, slow-down or stoppage pending or, to the actual knowledge of Seller, threatened against the Seller, there are neither pending nor to the actual knowledge of Seller threatened, any suits, actions, administrative proceedings, union organizing activities, arbitrations, grievances, complaints, charges, claims or other proceedings between Seller and any employees of Seller or any union representing such employees; and there are no existing labor or employment or other controversies or grievances involving employees of Seller which have had or are reasonably likely to constitute a Material Adverse Condition on the operation of the Sale Assets.

(c)    Seller is in compliance in all material respects with all laws, rules and regulations relating to the employment of labor and all employment contractual obligations, including those relating to wages, hours, collective bargaining, affirmative action, discrimination, sexual harassment, wrongful discharge and the withholding and payment of taxes and contributions except for such non-compliance which individually or in the aggregate would not constitute a Material Adverse Condition on the business or financial condition of Seller.

(d)    Seller is not liable to any present or former employees or any governmental authority for damages, arrears of wages or any tax or penalty for failure to comply with the foregoing labor matters set forth in this Section 3.8 except for such liability which individually or in the aggregate would not constitute a Material Adverse Condition on the business or financial condition of Seller.

3.9    Employee Benefit Plans. Buyer's consummation of the transactions contemplated

by this Agreement in accordance with the terms hereof shall not, as a result of or in connection with the transactions contemplated hereby, impose upon Buyer any obligation under any benefit plan, contract or arrangement (regardless of whether they are written or unwritten and funded or unfunded) covering employees or former employees of Seller in connection with their employment by Seller. For purposes of the Agreement, "benefit plans" shall include without limitation employee benefit plans within the meaning of  Section 3(3) of the Employee Retirement Income  Security Act of 1974, as amended, vacation benefits, employment and severance contracts, stock option plans, bonus programs and plans of deferred compensation. Seller acknowledges that Buyer has no obligation hereunder to offer employment to any employee of Seller.

      3.10    Compliance with Law.  Except as set forth on Schedule 3.10, Seller's business operations are in compliance with all federal, state, local or other laws, statutes, ordinances, regulations, and any applicable order, writ, injunction or decree of any court, commission, board, agency or other instrumentality except for such noncompliance which individually or in the aggregate would not constitute a Material Adverse Condition on the business or financial condition of Seller.

      3.11    Filing of Tax Returns. Seller has filed all federal, state and local tax returns which are required to be filed, and has paid all taxes and all assessments to the extent that such taxes and assessments have become due, other than such returns, taxes and assessments, the failure to file or pay would not, individually or in the aggregate, constitute a Material Adverse Condition.

      3.12    Absence of Insolvency. No judicial insolvency proceedings of any character including without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the Seller or any of the Sale Assets, are pending or to the actual knowledge of Seller threatened, and Seller has made no assignment for the benefit of creditors, nor taken any action with a view to, or which would constitute the basis for the institution of, any such judicial insolvency proceedings.

      3.13    Broker's or Finder's Fees. No agent, broker, investment banker or other Person or firm acting on behalf of or under the authority of Seller or any affiliate of Seller is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement.

      3.14    Insurance. There is now, and through the Closing Date there shall be, in full force and effect with reputable insurance companies fire and extended coverage insurance with respect to all material tangible Sale Assets and general insurance, all in commercially reasonable amounts, and the Sale Assets shall be insured to cover the full amount of any loss as has been maintained by the Seller on such items in the ordinary course of its Business.

      3.15    Compliance with Patriot Act. Seller is not nor will it become (i) a person whose property or interests in property are blocked pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) or (ii) a person or entity that knowingly engages in any dealings or transactions, or be otherwise knowingly associated, with any such person. Seller is not in violation of the Uniting And Strengthening America By

Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act) Act of 2001.

3.16    Limitations on the Representations and Warranties.    With regard to the representations and warranties made in this Agreement by the Sellers, the following limitations and qualifications shall apply:

(a)    A specific representation and warranty made hereunder shall prevail and take precedence over a general representation and warranty, and the Sellers shall have the right to claim under such specific representation and warranty in lieu of the general representation and warranty, and all such claims by the Sellers under the specific representation and warranty shall be Buyer's exclusive remedy for such claims; and

(b)    Except for the representations made by the Seller with respect per this Article 3 as limited or supplemented by the contents of the Schedules and Buyer's due diligence, neither the Seller, nor any of their respective shareholders, members, directors, managers, employees, representatives or any other person, makes any other express or implied representation or warranty on behalf of any Seller.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1    Organization and Good Standing. Buyer is a corporation, validly existing and in good standing under the laws of the State of Texas. Buyer has all requisite corporate power to own, operate and lease its properties and carry on its business as it is now being conducted and as the same will be conducted following the Closing.

4.2    Authorization and Binding Effect of Documents. Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary corporate action on the part of Buyer. Buyer has the power and authority to execute, deliver and perform its obligations under this Agreement and each of the other Documents and to consummate the transactions hereby and thereby contemplated. This Agreement and each of the other Documents have been, or at or prior to the Closing will be, duly executed by Buyer. The Documents, when executed and delivered by the parties hereto, will constitute the valid and legally binding agreement of Buyer, enforceable against Buyer in accordance with their terms, except as may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights or remedies generally, and except as may be limited by general principles of equity.

4.3    Absence of Conflicts. Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents and the consummation by Buyer of the transaction contemplated hereby and thereby:

11

       (a)    do not in any material respect (with or without the giving of notice or the passage of time or both) violate or result in the creation of any claim, lien, charge or encumbrance on any of the assets or properties of Buyer under any provision of law, rule or regulation or any order, judgment, injunction, decree or ruling applicable to Buyer in any manner which would have a material adverse effect on the assets, business, operation or financial condition or results of operations of Buyer;

       (b)    do not (with or without the giving of notice or the passage of time or both) conflict with or result in a breach or termination of, or constitute a default or give rise to a right of termination or acceleration under, the articles of incorporation or bylaws of Buyer or any lease, agreement, commitment, or other instrument which Buyer is a party to, bound by, or by which any of its assets or properties may be bound, the results of which would be a Material Adverse Condition.

    4.4    Governmental Consents and Consents of Third Parties. Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents and the consummation by Buyer of the transaction contemplated hereby and thereby, do not require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration or filing with, any court or public agency or other authority, or the consent of any Person under any agreement, arrangement or commitment of any nature to which Buyer is a party or by which it is bound, the failure of which to obtain would have a material adverse effect on the assets, business, operation or financial condition or results of operations of Buyer.

    4.5    Broker's or Finder's Fees. No agent, broker, investment banker, or other Person or firm acting on behalf of or under the authority of Buyer or any affiliate of Buyer is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from Seller in connection with transactions contemplated by this Agreement.

    4.6    Litigation. There are no legal, administrative, arbitration or other proceedings or governmental investigations pending or, to the actual knowledge of Buyer, threatened against Buyer that would give any third party the right to enjoin the transactions contemplated by this Agreement.

    4.7    Compliance with Patriot Act. Buyer is not nor will it become (i) a person whose property or interests in property are blocked pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) or (ii) a person or entity that knowingly engages in any dealings or transactions, or be otherwise knowingly associated, with any such person. Buyer is not in violation of the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act) Act of 2001.

    4.8    Financial Capability and Ability to Bear Economic Risks. Buyer is not insolvent or bankrupt and, to its knowledge, is not aware of any the existence of action, threat, circumstance or event that will likely cause it to be insolvent or bankrupt, or otherwise unable to perform,

through the end of its payment obligations to Sellers. Buyer represents that it has sufficient cash, liquid assets and/or credit so as to meet its payment obligations to Sellers as contemplated by this Agreement. The Buyer by reason of the business and financial experience of its management, has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement and the other transaction documents. The Buyer is able to bear the economic risks of this transaction and is able to sustain a loss without economic hardship if such a loss should occur.

4.9     Buyer's Knowledge and Experience.  The Buyer has had adequate opportunity to ask questions of, and receive answers from the Sellers, and the Seller's officers, employees, agents, accountants and representatives concerning the Business, operations, financial condition, assets, liabilities and all other matters relevant to Seller and the subject matter of this Agreement. As a result of its due diligence investigation, Buyer is knowledgeable about the Sale Assets and the Sellers and their operations, finances and Business.  Buyer has such knowledge and experience in financial and business matters and specifically the specific business and operations of the Seller that Buyer is capable of evaluating the merits and risks of the contemplated transaction. Buyer has conducted its own due diligence with respect to the Sale Assets, Assumed Obligations, Sellers and the operations, finances and Business of Sellers, and any other matter that Buyer believes to be material to a decision to enter into this Agreement or ancillary agreements or commitment arising from the contemplated transactions.

## ARTICLE V

## TRANSACTIONS COVENANTS

5.1     Employment of Ryan Windsor.  In consideration for the sale of the Sale Assets by Seller, Buyer agrees to employ Ryan Windsor at and following the Closing for up to twelve months pursuant to the form of Employment Agreement attached hereto as *Exhibit C*.

5.2     Domain Transfers. Seller and Buyer shall file with the applicable domain name registrars, within five business days after execution of this Agreement by the parties, such applications and other documents in the name of Seller or affiliated parties, as appropriate, as may be necessary or advisable to transfer ownership and registration rights in the Domain Names to Buyer.  Seller and Buyer, at Buyer's expense, shall take all commercially reasonable steps necessary to prosecute such filings with diligence, to the end that the transfer to Buyer may be obtained as soon as practicable.

5.3     Tax Returns and Payments. All taxes pertaining to ownership of the Sale Assets or operation of the Seller's business prior to the Closing Date will be timely paid when due; provided that Seller shall not be required to pay any such tax so long as the validity thereof shall be contested in good faith by appropriate proceedings. In the event that any refund is received at or after the Closing Date by Buyer that pertain to the Sale Assets or operations of Seller's business prior to Closing Date, Buyer shall have set aside and immediately deliver to Ryan Windsor on behalf of Sellers any such tax refund amounts.

5.4     Confidentiality; Press Release.

13

(a)     The terms of this transaction shall be kept confidential by the parties. Notwithstanding the foregoing and nothing contained herein shall prohibit Buyer or Seller from supplying or filing such information to a valid governmental or court authority to the extent required by law or identifying this transaction and its material provisions to those customers, suppliers, creditors, litigation parties and/or government entities that have a need to know as a result of its arrangements with the Buyer or Seller.

(b)     Except as expressly permitted hereunder, no public announcement shall be made about this transaction without the consent of both parties hereto.

(c)     In the event that either party determines in good faith that a press release or other public announcement is desirable under any circumstances, the parties shall consult with each other to determine the appropriate timing, form and content of such release or announcement.

5.5     Reasonable Best Efforts. Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable best commercial efforts to take all action and to do all things necessary, proper or advisable to satisfy any condition to the parties' obligations hereunder in its power to satisfy and to consummate and make effective as soon as practicable the transactions contemplated by this Agreement.

5.6     Material Breach.  Buyer agrees that, in the event Buyer fails to perform its obligations hereunder with respect to the assumption of liabilities, or any of them, such failure would constitute a material breach of this Agreement, which would entitle Seller to any all remedies available to it under the law and in equity, including (without limitation) the right to rescission of the Agreement or assignment back of the Sale Assets.

## ARTICLE VI

## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER TO CLOSE

Buyer's obligation to close the transaction contemplated by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, unless waived by Buyer in writing:

6.1     Accuracy of Representations and Warranties. The representations and warranties of Seller contained in this Agreement or in any other Document shall be complete and correct in all material respects on the Closing Date with the same effect as though made at such time except for changes that do not constitute a Material Adverse Condition on Buyer, the Seller's business, or the Sale Assets taken as a whole.

6.2     Performance of Agreements.  Seller shall have performed in all material respects all of its covenants, agreements and obligations required by this Agreement and each of the other Documents to be performed or complied with by it upon the Closing Date.

6.3     Adverse Proceedings. Neither Seller nor any affiliate of Seller shall be subject to any ruling, decree, order or injunction restraining, imposing material limitations on or prohibiting (i) the consummation of the transactions contemplated hereby or (ii) its participation in the operation, management, ownership or control of the Seller's business; and no litigation, proceeding or other action seeking to obtain any such ruling, decree, order or injunction shall be pending. No governmental authority having jurisdiction shall have notified any party to this Agreement that consummation of the transaction contemplated hereby would constitute a violation of the laws of the United States or of any state or political subdivision or that it intends to commence proceedings to restrain such consummation or to force divestiture, unless such governmental authority shall have withdrawn such notice. No governmental authority having jurisdiction shall have commenced any such proceeding.

6.4     Delivery of Closing Documents.  Seller shall have delivered or caused to be delivered to Buyer on the Closing Date each of the Documents required to be delivered pursuant to Section 8.2.

ARTICLE VII

CONDITIONS PRECEDENT OF THE OBLIGATION OF SELLER TO CLOSE

The obligation of Seller to close the transaction contemplated by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, unless waived by Seller in writing:

7.1     Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement shall be complete and correct in all material respects on at the Closing Date with the same effect as though made at such time except for changes that are not materially adverse to Seller.

7.2     Performance of Agreements. Buyer shall have performed in all material respects all of its covenants, agreements and obligations required by this Agreement and each of the other Documents to be performed or complied with by it on the Closing Date.

7.3     Consents.

(a)     All authorizations, consents, approvals and clearances of all federal, state and local governmental agencies required to permit the consummation by Seller of the transactions contemplated by this Agreement shall have been obtained; all statutory and regulatory requirements for such consummation shall have been fulfilled; and no such authorizations, consents, approvals or clearances shall contain any conditions that individually or in the aggregate would have any material adverse effect on Seller.

7.4     Adverse Proceedings. Buyer shall not be subject to any ruling, decree, order or injunction restraining, imposing material limitations on or prohibiting: (i) the consummation of the transactions contemplated hereby or (ii) its participation in the operation, management, ownership or control of the Buyer's business; and no litigation, proceeding or other action seeking to obtain any such ruling, decree, order or injunction shall be pending. No governmental authority

15
EXHIBIT A - Page 15 of 25

having jurisdiction shall have notified any party to this Agreement that consummation of the transactions contemplated hereby would constitute a violation of the laws of the United States or of any state or political subdivision or that it intends to commence proceedings to restrain such consummation or to force divestiture, unless such governmental authority shall have withdrawn such notice. No governmental authority having jurisdiction shall have commenced any such proceeding.

7.5     Delivery of Closing Documents and Purchase Price. Buyer shall have delivered or caused to be delivered to Seller on the Closing Date each of the Documents required to be delivered pursuant to Section 8.3, and Buyer shall be ready, willing and able to deliver the Purchase Price in the form of payment set forth in this Agreement and its Exhibits and to assume and satisfy the Assumed Obligations set forth in Section 2.4.

ARTICLE VIII

CLOSING

8.1     Time and Place. Unless otherwise agreed to in advance by the parties, Closing shall take place at the offices of Seller or its counsel on the Closing Date.

8.2     Documents to be Delivered to Buyer by Seller. At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(a)     Certified resolutions of Seller's shareholders approving the execution and delivery of this Agreement and each of the other Documents and authorizing the consummation of the transactions contemplated hereby and thereby.

(b)     True and correct copies of the records described in Section 2.l(d) shall be available at the offices of Seller.

8.3     Documents to be Delivered to Seller by Buyer. At the Closing, Buyer shall deliver or cause to be delivered to Seller the following:

(a)     Certified resolutions of Buyer's Managers approving the execution and delivery of this Agreement and each of the other Documents and authorizing the consummation of the transaction contemplated hereby and thereby.

(b)     The Purchase Price, both in the form of a wire transfer and promissory notes as set forth in *Exhibit B*.

ARTICLE IX

SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

9.1     Survival of Representation and Warranties. All representations, warranties,

covenants and agreements contained in this Agreement or in any other Document shall survive the Closing for the Survival Period and the Closing shall not be deemed a waiver by either party of the representations, warranties, covenants or agreements of the other party contained herein or in any other Document. No claim may be brought under this Agreement or any other Document unless written notice describing in reasonable detail the nature and basis of such claim is given on or prior to the last day of the Survival Period. In the event such a notice is so given, the right to indemnification with respect thereto under this Article shall survive the Survival Period until such claim is finally resolved and any obligations with respect thereto are fully satisfied. For purposes of this agreement the "Survival Period" shall be twelve (12) months after the Closing Date, except that any representation or warranty of Buyer or Seller as to (i) such party's qualification and authority to consummate the transactions contemplated hereby, (ii) title of the parties to the Sale Assets, (iii) any tax obligation of Seller, or (v) Section 3.7 (Litigation), the Survival Period shall be twenty-four (24) months.

9.2    Indemnification in General. Buyer and Seller agree that the rights to indemnification and to be held harmless set forth in this Agreement shall, as between the parties hereto and their respective successors and assigns, be exclusive of all rights to indemnification and to be held harmless that such party (or its successors or assigns) would otherwise have by statute, common law or otherwise. Except with regard to actual fraud or intentional misrepresentation in connection with the transaction described herein, each party's rights under this Article shall be the sole and exclusive remedies with respect to claims resulting from or relating to any misrepresentation, breach of warranty or failure to perform any covenant or agreement contained in this Agreement or otherwise relating to the transactions that are the subject of this Agreement. Without limiting the generality of the foregoing, in no event shall either party or any Person claiming through, by or on behalf of either party, be entitled to claim or seek rescission of the transactions consummated under this Agreement.

9.3    Indemnification by Seller.

(a)    Subject to the provisions of Section 9.3(b) below, Seller shall indemnify and hold harmless Buyer and any officer, director, agent, employee and affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including reasonable attorneys' fees), relating to or arising out of:

(i)  Any breach or non-performance by Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Documents through the Survival Period;

(ii)  The ownership or operation by Seller of the Sale Assets on or prior to the Closing Date, other than the Assumed Obligations;

(iii)  All other liabilities and obligations of Seller other than the Assumed Obligations; or

(iv) Buyer being named as a party in any matter listed on Schedule 3.7, or

17

Buyer being named as a party (other than as plaintiff) by any party (other than Seller) to any of the matters listed on Schedule 3.7, in an action relating to or arising out of this Agreement or the transactions contemplated hereby other than as a result of the acts or omissions of Buyer and excluding those matters listed on Schedule 3.7 that are or relate to the Assumed Obligations.

(b)     Except for any amounts owed by Seller to Buyer under Section 9.3(a)(iv), and Section 2.7, if Closing occurs, Seller shall not be obligated until the amount of such claims, liabilities, damages, losses, costs and expenses exceeds Buyer's Threshold Limitation, in which case Buyer shall then be entitled to indemnification of the entire amount.

9.4     Indemnification by Buyer.

(a)     Subject to the provisions of Section 9.4(b) below, Buyer shall indemnify and hold harmless Seller and any officer, director, agent, employee and affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of:

(i)  Any breach or non-performance by Buyer of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Document;

(ii)  The ownership or operation of the Seller's business and/or the use of the Sale Assets after the Closing Date; or

(iii)  All other liabilities or obligations of Buyer pursuant to the terms of this Agreement, including, without limitation, the Assumed Obligations.

(b)     Except for any amounts owed by Buyer to Seller or Rodney Smith and the performance of the Assumed Obligations, if Closing occurs, Buyer shall not be obligated until the amount of such claims, liabilities, damages, losses, costs and expenses exceeds Seller's Threshold Limitation, in which case Seller shall then be entitled to indemnification of the entire amount.

(c)     In addition to, and not in lieu of the remedies otherwise provided herein with regard to indemnification from Buyer, in the event that a Bankruptcy Event applies to Buyer prior to its successfully and fully satisfying its obligations to Sellers with regard to the Assumed Obligations (Section 2.3) or Payment of Purchase Price (Section 2.4), then Seller may exercise its rights, including (without limitation) with regard to a Material Breach per Section 5.6.

9.5     Indemnification Procedures. In the event that an Indemnified Party may be entitled to indemnification hereunder with respect to any asserted claim of, or obligation or liability to, any third party, such party shall notify the Indemnifying Party thereof, describing the matters involved in reasonable detail, and the Indemnifying Party shall be entitled to assume the defense thereof upon written notice to the Indemnified Party with counsel reasonably satisfactory to the Indemnified Party; provided, that once the defense thereof is assumed by the Indemnifying Party,

the Indemnifying Party shall keep the Indemnified Party advised of all developments in the defense thereof and any related litigation, and the Indemnified Party shall be entitled at all times to participate in the defense thereof at its own expense. If the Indemnifying Party fails to notify the Indemnified Party of its election to defend, or contests its obligation to indemnify under this Article IX, the Indemnified Party may pay, compromise, or defend such a claim without prejudice to any right it may have hereunder.

## ARTICLE X

## MISCELLANEOUS

10.1  Further Actions. From time to time before, at and after the Closing, each party, at its expense and without further consideration unless otherwise specified herein, will execute and deliver such documents to the other party as the other party may reasonably request in order more effectively to consummate the transactions contemplated hereby.

10.2  Access After the Closing Date. After the Closing and for a period of the longer of: (i) twelve (12) months, and (ii) such reasonable period of time as Seller may require in order to defend or prosecute any litigation, investigation, liability or claim involving the Business, Assumed Liabilities, Sale Assets or subject matter of this Agreement, Buyer shall provide Seller, Seller's counsel, accountants and other representatives with reasonable access during normal business hours to the books, records, property, personnel, contracts, commitments and documents of Buyer pertaining to the Sale Assets, Assumed Obligations, Business or transactions occurring prior to, at or after the Closing Date that are the responsibility and obligation of the Seller, when requested by Seller, and Buyer shall retain such books and records for the normal document retention period of Buyer. At the request and reasonable expense of Seller, Buyer shall deliver copies of any such books and records to Seller.

10.3  Payment of Expenses.

(a)     Any fees assessed for the transfer and/or renewal of the Domain Names shall be the responsibility of Buyer.

(b)     All state or local sales or use, stamp or transfer, grant and other similar taxes payable in connection with consummation of the transactions contemplated hereby shall be shared equally between Seller and Buyer.

(c)     Except as otherwise expressly provided in this Agreement, each of the parties shall bear its own expenses, including the fees of any attorneys and accountants engaged by such party, in connection with this Agreement and the consummation of the transactions contemplated herein.

10.4  Notices. All notices, demands or other communications given hereunder  shall be in writing and shall be sufficiently given if delivered by courier or sent by registered or certified mail, first class, postage prepaid, or by facsimile machine or similar written means of

communication, addressed as follows:

    (a)    If to Seller, to:

        Alcatraz Media, Inc.
        8200 Roberts Drive, Ste. 205
        Atlanta, Georgia 30350
        Attention:    Ryan Windsor
        Telephone:   (415) 717-8978
        Email:      ryan@alcatrazmedia.com

        With a copy to:

        Taylor English Duma LLP
        1600 Parkwood Circle, Suite 400
        Atlanta, Georgia 30339
        Attention:    Henry Quillian, Esq.
        Telephone:   (770) 434-6868
        Email:      hquillian@taylorenglish.com

    (b)    If to Buyer, to:

        Tom Schmidt
        Schmidt Law Firm, PLLC
        7880 San Felipe, Suite 210
        Houston, Texas 77063
        Telephone: (713) 568-4899
        Email:      tom@schmidtfirm.com

or such other address with respect to any party hereto as such party may from time to time notify (as provided above) to the other party hereto. Any such notice, demand or communication shall be deemed to have been given (i) if so mailed, as of the close of the third (3rd) business day following the date mailed, and (ii) if personally delivered or otherwise sent as provided above, on the date received. A copy of any notice sent shall be provided by email at the above specified email address, although the delivery of such email shall not constitute notice for the purposes of this Agreement.

    10.5  Entire Agreement. This Agreement, the Schedules and Exhibits hereto, and the other Documents constitute the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings or arrangements between the parties with respect to the subject matter hereof.

    10.6  Binding Effect; Benefits. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns. Except to the extent specified herein, nothing in this Agreement, express or implied,

shall confer on any Person other than the parties hereto and their respective successors or assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

10.7  Assignment. This Agreement and any rights hereunder shall not be assignable by either party hereto without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Buyer may in its sole and absolute discretion, assign all of its right, title, interest  and obligation under this Agreement to any entity controlled by, or under common control with Buyer; provided, however, that each such assignor and assignee shall be jointly and severally liable for Buyer's obligations hereunder.

10.8  Governing Law. This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Texas, including all matters of construction, validity and performance.

10.9  Bulk Sales. Buyer hereby waives compliance by Seller with the provisions of the Bulk Sales Act and similar laws of any state or jurisdiction, if applicable.

10.10 Amendments and  Waivers. No term or provision of this Agreement may be amended, waived, discharged or terminated orally but only by an instrument in writing signed by the party against whom the enforcement of such amendment, waiver, discharge or termination is sought. Any waiver shall be effective only in accordance with its express terms and conditions.

10.11 Severability. If any provision of this Agreement, or the application thereof to any Person or entity or any circumstance, is invalid or unenforceable in any jurisdiction, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the extent and purpose of such invalid and unenforceable provision, and (ii) the remainder of this Agreement and the application of such provision to other Persons, entities or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

10.12 Headings. Except as provided in Article I, the captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

10.13 Counterparts. This Agreement may be executed in any number of counterparts, and by either party on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Fax signatures shall be deemed the same as original signatures. This Agreement is not binding until executed by both parties hereto.

10.14 References. All references in this Agreement to Articles and Sections are to Articles and Sections contained in this Agreement unless a different document is expressly specified.

10.15 Schedules and Exhibits.  Unless otherwise specified herein, each Schedule and Exhibit referred to in this Agreement is attached hereto, and each such Schedule and Exhibit is hereby incorporated by reference and made a part hereof as if fully set forth herein.

10.16 Attorneys' Fees. If any action at law or equity is brought, whether in a judicial proceeding or arbitration, to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses from the other party, which fees and expenses shall be in addition to any other relief, which may be awarded.

10.17 Knowledge. All references to the knowledge or awareness of Seller or Buyer shall refer to the Seller's or Buyer's respective actual knowledge, assuming a reasonable degree of investigation by such party in the ordinary course of its business.

*Signatures appear on following page.*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written.

"SELLER":

ALCATRAZ MEDIA, INC.

By: _____

Name: _____

Title: _____

"BUYER":

CITY INFO EXPERTS, LLC

By: _____

Name: _C. Thomas Schmidt_

Title: _CEO + Manager_

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule  2.1(a) | List of Tangible Personal Property |
| Schedule 2.1(b) | List of Supplier Agreements |
| Schedule 2.1(e) | List of Domain Names |
| Schedule  2.1(g) | Trade names, Trademarks & Logos |
| Schedule 2.1(i) | Description of Software |
| Schedule  2.3 | List of additional liabilities assumed by Buyer |
| Schedule 3.7 | List of Litigation |
| Schedule 3.10 | Compliance with Law |

These Schedules are not intended to constitute, and shall not be construed as constituting, any representation or warranty of Seller except as and to the extent expressly provided in the Agreement.  The fact that any item of info1mation is contained herein shall not, in and of itself, be construed to mean that such information is required to be disclosed in or by the Agreement or that such item of information is "material" as such term is used in the Agreement.

Seller has not undertaken to describe the contents of documents referred to in these Schedules. Instead, references to such documents are qualified in their entirety by the text of such documents.  Furthermore, the reference to any document is deemed to include any and all exhibits, schedules, annexes and other attachments to such document.

Any matter disclosed in one Schedule hereof in such a way as to make its relevance to information called for by another Schedule readily apparent shall be deemed to be disclosed in such other Schedules, notwithstanding the omission of an appropriate cross-reference. The headings in these Schedules are for convenience of reference only and shall not be deemed to alter or affect the express description of the sections of these Schedules as set forth in the Agreement.

## EXHIBIT A

List of Alcatraz Affiliated Entities:

    (a)  Alcatraz Media, LLC, a California limited liability company
    (b)  Everybody Loves Travel, LLC, a Delaware limited liability company
    (c)  Reserve 123, Inc., a Delaware Non-Stock Corporation
    (d)  Reserve XL, Inc., a Delaware Non-Stock Corporation
    (e)  Take 5 Tours, Inc., a Delaware Non-Stock Corporation

## EXHIBIT B

Promissory Note (Rodney Smith) – See separate attachment.

## EXHIBIT C

Employment Agreement for Ryan Windsor – See separate attachment.

# EXHIBIT B

ASSET PURCHASE AGREEMENT

This AGREEMENT (this "Agreement") is dated as of <u>July 8, 2015</u> by and between Cwiss Holdings LP, a Texas limited partnership ("Cwiss" or "Seller") and City Info Experts, LLC ("Buyer").

RECITALS:

Whereas, Cwiss owns and/or licenses certain intellectual property and other assets to Alcatraz Media, Inc. and its affiliated entities so that they may operate websites that market tour products, software to operate those websites and to manage the business, has contracts with suppliers, and maintains a customer database (collectively, the "Business"); and

Whereas, Buyer desires to acquire the Sale Assets (as defined elsewhere herein), and Seller is willing to convey such assets to Buyer, per the transaction specified in this Agreement;

Whereas, Seller desires to have Buyer assume responsibility for and to indemnify Seller and its Indemnified Parties (as defined elsewhere herein) with regard to certain liabilities, and Buyer is willing to assume responsibility and indemnify;

NOW THEREFORE, in consideration of the foregoing and the mutual covenants and agreements contained herein, Seller and Buyer hereby agree as follows:

ARTICLE I

TERMINOLOGY

1.1     Assumed Obligations. Such term shall have the meaning defined in Section 2.3.

1.2     Business Day. Any calendar day, excluding Saturdays and Sundays, on which federally chartered banks are regularly open for business.

1.3     Buyer's Threshold Limitation. As provided in Section 9.3(b), the threshold dollar amount for the aggregate of claims, liabilities, damages, losses, costs and expenses that must be incurred by Buyer before Seller shall be obligated to indemnify Buyer. The Buyer's Threshold Limitation shall be equal to one thousand Dollars ($1,000).

1.4     Closing. The closing with respect to the transactions contemplated by this Agreement.

1.5     Closing Date. <u>July 8, 2015</u>.

1.6     Documents. This Agreement and all Exhibits and Schedules hereto, the Asset

Purchase Agreement between Buyer and Alcatraz Media, Inc., and each other agreement, certificate, or instrument delivered pursuant to or in connection with this Agreement, including amendments thereto that are expressly permitted under the terms of this Agreement.

1.7     Excluded Assets.  Such term shall have the meaning defined in Section 2.2.

1.8     Indemnified Party.  Any party described in Section 9.3 or Section 9.4 against which any claim or liability may be asserted by a third party which would give rise to a claim for indemnification under the provisions of this Agreement by such party.

1.9     Indemnifying Party. The party to the Agreement (not the Indemnified Party) that, in the event of a claim or liability asserted by a third party against the Indemnified Party which would give rise to a claim for indemnification under the provisions of this Agreement, is obligated to indemnify and hold harmless the Indemnified Party to the extent expressly provided in this Agreement.

1.10    Liens.  Any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, lien, lease or charge of any kind, whether voluntarily incurred or arising by operation of law or otherwise, affecting any Sale Assets, including any written or oral agreement to give or grant any of the foregoing, any conditional sale or other title retention agreement, and the filing of or agreement to give any financing statement with respect to any Sale Assets under the Uniform Commercial Code or comparable law of any jurisdiction.

1.11    Material Adverse Condition. A condition, event or circumstance which would materially restrict, limit, increase the cost or burden of or otherwise materially adversely affect or materially impair the right to the ownership, use, control, enjoyment or operation of the Sale Assets or the proceeds therefrom.

1.12    OSHA Laws. The Occupational Safety and Health Act of 1970, as amended, and all other federal, state or local laws or ordinances, including orders, rules and regulations thereunder, regulating or otherwise affecting health and safety of the workplace.

1.13    Permitted Lien. For purposes hereof, "Permitted Lien" shall mean (i) statutory liens for taxes not due and payable or, that are being contested in good faith by appropriate proceedings; (ii) mechanics, materialmen's, caniers', warehousemen's, landlords' or other similar liens in the ordinary course of business for sums not yet due or which are being contested in good faith by appropriate proceedings; (iii) liens or mortgages that will be released at Closing; and/or (iv) a Lien securing only an Assumed Obligation.

1.14    Person. Any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency or political subdivisions thereof.

1.15    Purchase Price. The consideration to be paid by Buyer to Seller for purchase of the Sale Assets.  The Purchase Price is the sum of the Assumed Amex Liability, the Assumed

General Liabilities, the Assumed Deferred Revenues, and the Cash Purchase Price.

1.16    Sale Assets. All of the tangible and intangible assets applicable to the Business to be transferred by Seller to Buyer as set forth in Section 2.1.

1.17    Seller's Threshold Limitation.  As provided in Section 9.4(b), the threshold dollar amount for the aggregate of claims, liabilities, damages, losses, costs and expenses that must be incurred by Seller before Buyer shall be obligated to indemnify Seller.   The Seller's Threshold Limitation shall be equal to One Thousand Dollars ($1,000).

1.18    Tangible Personal Property. All equipment, computers, furniture, supplies, and other tangible personal property maintained by Seller, together with such modifications , replacements, and improvements, made thereto.

ARTICLE II

PURCHASE AND SALE

2.1    Sale Assets. On the Closing Date, Seller will sell, transfer, assign and convey to Buyer, and Buyer will purchase from Seller, free and clear of all Liens, except Permitted Liens, all of Seller's right, title and interest, legal and equitable, in and to the tangible and intangible, real, personal and mixed assets (except Excluded Assets) set forth below:

(a)    Domain Names. The identified domain names included on Schedule 2.1(a), including any trademark, copyright, and other rights associated with the domain name itself and all Internet traffic to the domain name;

(b)    Websites. All website code, content, page layouts, templates, content management system data, graphics, databases, data, forms, scripts, and any other code, information or content associated with websites operated for the Business by the Seller on the Domain Names;

(c)    Trademarks and Intellectual Property.  All trade names, trademarks, logos and like intellectual property rights, registered or otherwise, as well as all copyrights, code, knowledge, trade secrets, operations plans, website marketing strategies, and other intellectual property with regard to the Sale Assets described on Schedule 2.1(c) as developed by and either owned by Seller or licensed to Seller by Cwiss;

2.2    Excluded Assets. Notwithstanding any provision of this Agreement to the contrary, Seller shall not transfer, convey or assign to Buyer, but shall retain all of its right, title and interest in and to, the following assets owned or held by it on the Closing Date ("Excluded Assets"):

(a)    Any and all cash, cash equivalents, cash deposits  to secure  contract obligations, all receivables from any affiliate or licensee of Seller and all other accounts

receivable, bank deposits and securities held by Seller in respect of the Sale Assets at the Closing Date.

(b)    Any and all claims of Seller with respect to transactions prior to the Closing including, without limitation, claims for tax refunds.

(c)    All prepaid expenses.

(d)    All contracts of insurance and claims against insurers.

(e)    All employee benefit plans and the assets thereof and all employment contracts

(f)    All others assets (i.e., tangible personal property, records, documents, intellectual property, domain names, and etc. not included with the Sale Assets or not owned by the Sellers and used with the Business.

2.3    Assumption of Liabilities.

(a)    At the Closing, Buyer shall assume and agrees to diligently perform, without duplication of Seller's performance, and be financially responsible for the following liabilities and obligations of Seller (the "Assumed Obligations"):

(i)    The liability and obligations to for amounts, fees, charges and/or interest incurred on the following American Express cards owned and/or used by Sellers or their owners, up to a limit of $850,000.00:



(a) **AMEX Black Card** – #████████ 76009, expires ████
      CVV 9█████

(b) **AMEX Platinum Card** – #████████████ 51001, expires
      unknown – CVV ███████ and

(c) **AMEX Blue Card** – ████████ 52001, expires█████
      CVV █████

(ii)    The obligations of Ryan Windsor to guaranty Seller's obligations and liability to American Express.

(iii)    The obligations, if any, specifically listed in Schedule 2.3.

(b) Except for the Assumed Obligations, Buyer shall not assume or in any manner be liable for any debts, liens, charges, claims, encumbrances, duties, responsibilities, obligations or liabilities of Seller of any kind or nature, whether express or implied, known or unknown, contingent or absolute, including, without limitation, any liabilities to or in connection with (i) Seller's employees whether arising in connection with the transaction contemplated hereunder or otherwise, or (ii) any actions, suits, claims, investigations or administrative, arbitration or other

proceedings pending or threatened against Seller or any existing or pending orders, judgments or decrees of any court or governmental agency affecting Seller or any of the Sale Assets.

2.4     Payments Of Purchase Price.  At the Closing, and in addition to the Assumed Obligations, Buyer shall pay the Purchase Price as follows:

(a)     By wire transfer of immediately available funds Thirty-Five Thousand and Five Hundred Dollars ($35,500) to Seller ("Cash Purchase Price");

(b)     As described in the Asset Purchase Agreement between Buyer and Alcatraz Media, Inc., of even date herewith, upon the Closing of this Agreement with Seller, Ryan Windsor will be issued such number of Restricted Shares / Membership Units in Buyer with a value of $150,000 based upon the fair market value of Buyer as of the Closing Date. On both the one-year and two-year anniversaries of the Closing Date, provided that Ryan Windsor's employment has not been either terminated for cause or ended as a result of his resignation without Good Reason, Ryan Windsor shall be issued additional Restricted Shares in Buyer with a value of $150,000 at the time of such anniversary.  Notwithstanding the foregoing, in the event of a likely change of control of the Buyer, or the likely sale of substantially all of the assets of the Buyer, all Restricted Shares that have not yet been issued shall be immediately issued to you just prior to, or contemporaneously with, such event. "Good Reason" and "Cause" shall have the meanings set forth in the Employment Agreement entered into between Buyer and Ryan Windsor.

(c)     As described in the Asset Purchase Agreement between Buyer and Alcatraz Media, Inc., of even date herewith, upon the Closing of this Agreement with Seller, Ryan Windsor shall be issued 3,800 Membership Interests in Buyer.  Said shares shall be fully vested and unencumbered as of the Closing Date, but shall bear the restrictions limiting sale pursuant to the laws of the United States and the several states.

2.5     Allocation of the Purchase Price. Buyer and Seller will use reasonable good faith efforts to agree upon an allocation of the Purchase Price within 30 days of the Closing Date. Buyer and Seller shall use any such allocation for all reporting purposes in connection with federal, state and local income and, to the extent permitted under applicable law, franchise taxes. Buyer and Seller agree to report any such allocation to the Internal Revenue Service in the form required by Treasury Regulation § 1.1060-1T.

2.6     Appointment of Representative.

(a)     Cwiss, hereby irrevocably constitutes and appoints Ryan Windsor its true and lawful attorney-in-fact, with full power of substitution, in its name, place and stead, to execute, acknowledge, deliver, swear to, file, and record such documents, certificates or agreements as may be necessary or appropriate to carry out the.  The appointment of Ryan Windsor as its attorney-in-fact shall be deemed to be a power coupled with an interest and irrevocable, and shall survive the bankruptcy, death, incompetence or dissolution of Cwiss.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer as of the Closing Date as follows:

3.1     Organization and Good Standing. Cwiss is a limited partnership duly organized and validly existing in the State of Texas. Seller has all requisite power to own, license, operate and/or lease its properties and carry on its business as it is now being conducted and as the same will be conducted until the Closing.

3.2     Authorization and Binding Effect of Documents. Seller's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents, and the consummation by Seller of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary action on the part of Seller, and no other proceedings on the part of the Seller are necessary to authorize and approve this Agreement. As of the date hereof, the director or managing member of Seller has determined that the transaction contemplated by this Agreement is advisable and in the best interest of its partners. Seller has the power and authority to execute, deliver and perform its obligations under this Agreement and each of the other Documents and to consummate the transactions hereby and thereby contemplated. This Agreement and each of the other Documents have been, or at or prior to the Closing will be, duly executed by Seller. The Documents, when executed and delivered by the parties hereto, will constitute legal and valid obligations of Seller enforceable against it in accordance with their terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and similar laws affecting the enforcement of creditors' rights or remedies generally, and except as may be limited by general principles of equity.

3.3     Absence of Conflicts. The execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents by Seller, and the consummation of the transactions contemplated hereby and thereby:

> (a)   do not in any material respect (with or without the giving of notice or the passage of time or both) violate, or result in the creation of any Lien other than a Permitted Lien, on any of the Sale Assets under any provision of law, rule or regulation or any order, judgment, injunction, decree or ruling applicable to Seller;

> (b)   do not (with or without the giving of notice or the passage of time or both) conflict with or result in a breach or termination of, or constitute a default or give rise to a right of termination or acceleration under the articles of partnership of Seller; or

> (c)   do not, pursuant to any lease, agreement, commitment or other instrument which Seller is a party to, or bound by, or by which any of the Sale Assets may be bound, result in the creation of any Lien, other than a Permitted Lien, upon any of the Sale Assets.

3.4     Governmental Consents and Consents of Third Parties.   The execution and delivery of, and the performance of Seller's obligations under, this Agreement and each of the

other Documents by Seller, and the consummation by Seller of the transactions contemplated hereby and thereby, do not require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration of filing with, any court or public agency or governmental body or other authority, or the consent of any Person under any agreement, arrangement or commitment of a nature to which Seller is a party or by which it is bound or by which the Sale Assets are bound or to which they are subject to, the failure of which to obtain would constitute a Material Adverse Condition on the Sale Assets.

3.5    Tangible Personal Property. Except for supplies and other incidental items which in the aggregate are not of material value, there is no Tangible Personal Property owned by the Seller that is licensed or leased for use with the Business.:

3.6    Domain Names. Seller is the licensor of the domain names listed on Schedule 2.1(e), and except as set forth on such Schedule, (i) the domain names are valid, in good standing and in full force and effect to the actual knowledge of Seller; (ii) no application, action or proceeding is pending, or, to Seller's actual knowledge is threatened, which may result in the revocation, modification, non-renewal or suspension of any of the domain names, the denial of any pending applications, the issuance of any cease and desist order or the imposition of any fines, forfeitures or other administrative actions by any party with respect to the domain names or its operation; (iii) Seller has complied in all material respects with all requirements to update its contact and other information with the domain registrar with respect to the domain names, and all such reports, applications and documents are complete and correct in all material respects; (iv) to Seller's actual knowledge, there are no matters, which could reasonably be expected to result in the suspension, revocation, cancellation, modification of or the refusal to renew any of the domain names.

3.7    Litigation. There are no actions, suits, claims, investigations or administrative, arbitration or other proceedings pending or to the actual knowledge of Seller threatened against Seller or any affiliate of Seller which would, individually or in the aggregate if adversely determined, be a Material Adverse Condition on the Sale Assets, or which would give any third party the right to enjoin the transactions contemplated by this Agreement. There are no existing or pending orders, judgments or decrees of any court or governmental agency affecting Seller or any of the Sale Assets which would materially adversely affect the Sale Assets.

3.8    Labor Matters.

(a)    Seller is not a party to any collective bargaining agreement, and there is no collective bargaining agreement that determines the terms and conditions of employment of any employees of Seller.

(b)    With respect to the operation of Seller's business, there is no labor strike, dispute, slow-down or stoppage pending or, to the actual knowledge of Seller, threatened against the Seller, there are neither pending nor to the actual knowledge of Seller threatened, any suits, actions, administrative proceedings, union organizing activities, arbitrations, grievances, complaints, charges, claims or other proceedings between Seller and any employees of Seller or any union representing such employees; and there are no existing labor or employment or other

controversies or grievances involving employees of Seller which have had or are reasonably likely to constitute a Material Adverse Condition on the operation of the Sale Assets.

(c)    Seller is in compliance in all material respects with all laws, rules and regulations relating to the employment of labor and all employment contractual obligations, including those relating to wages, hours, collective bargaining, affirmative action, discrimination, sexual harassment, wrongful discharge and the withholding and payment of taxes and contributions except for such non-compliance which individually or in the aggregate would not constitute a Material Adverse Condition on the business or financial condition of Seller.

(d)    Seller is not liable to any present or former employees or any governmental authority for damages, arrears of wages or any tax or penalty for failure to comply with the foregoing labor matters set forth in this Section 3.8 except for such liability which individually or in the aggregate would not constitute a Material Adverse Condition on the business or financial condition of Seller.

3.9    Employee Benefit Plans.  Buyer's consummation of the transactions contemplated by this Agreement in accordance with the terms hereof shall not, as a result of or in connection with the transactions contemplated hereby, impose upon Buyer any obligation under any benefit plan, contract or arrangement (regardless of whether they are written or unwritten and funded or unfunded) covering employees or former employees of Seller in connection with their employment by Seller. For purposes of the Agreement, "benefit plans" shall include without limitation employee benefit plans within the meaning of  Section 3(3) of the Employee Retirement Income  Security Act of 1974, as amended, vacation benefits, employment and severance contracts, stock option plans, bonus programs and plans of deferred compensation. Seller acknowledges that Buyer has no obligation hereunder to offer employment to any employee of Seller.

3.10    Compliance with Law.  Except as set forth on Schedule 3.10, Seller's business operations are in compliance with all federal, state, local or other laws, statutes, ordinances, regulations, and any applicable order, writ, injunction or decree of any court, commission, board, agency or other instrumentality except for such noncompliance which individually or in the aggregate would not constitute a Material Adverse Condition on the business or financial condition of Seller.

3.11    Filing of Tax Returns. Seller has filed all federal, state and local tax returns which are required to be filed, and has paid all taxes and all assessments to the extent that such taxes and assessments have become due, other than such returns, taxes and assessments, the failure to file or pay would not, individually or in the aggregate, constitute a Material Adverse Condition.

3.12    Absence of Insolvency. No judicial insolvency proceedings of any character including without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting the Seller or any of the Sale Assets, are pending or to the actual knowledge of Seller threatened, and Seller has made no assignment for the benefit of creditors, nor taken any action with a view to, or which would constitute the basis for the institution of, any such judicial insolvency proceedings.

3.13   Broker's or Finder's Fees. No agent, broker, investment banker or other Person or firm acting on behalf of or under the authority of Seller or any affiliate of Seller is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, in connection with the transactions contemplated by this Agreement.

3.14   Insurance. There is now, and through the Closing Date there shall be, in full force and effect with reputable insurance companies fire and extended coverage insurance with respect to all material tangible Sale Assets and general insurance, all in commercially reasonable amounts, and the Sale Assets shall be insured to cover the full amount of any loss as has been maintained by the Seller on such items in the ordinary course of its Business.

3.15   Compliance with Patriot Act. Seller is not nor will it become (i) a person whose property or interests in property are blocked pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) or (ii) a person or entity that knowingly engages in any dealings or transactions, or be otherwise knowingly associated, with any such person. Seller is not in violation of the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act) Act of 2001.

3.16   Limitations on the Representations and Warranties.   With regard to the representations and warranties made in this Agreement by the Sellers, the following limitations and qualifications shall apply:

(a)   A specific representation and warranty made hereunder shall prevail and take precedence over a general representation and warranty, and the Sellers shall have the right to claim under such specific representation and warranty in lieu of the general representation and warranty, and all such claims by the Sellers under the specific representation and warranty shall be Buyer's exclusive remedy for such claims; and

(b)   Except for the representations made by the Seller with respect per this Article 3 as limited or supplemented by the contents of the Schedules and Buyer's due diligence, neither the Seller, nor any of their respective partners, managers, employees, representatives or any other person, makes any other express or implied representation or warranty on behalf of any Seller.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

4.1   Organization and Good Standing. Buyer is a corporation, validly existing and in good standing under the laws of the State of Texas. Buyer has all requisite corporate power to own, operate and lease its properties and carry on its business as it is now being conducted and as the same will be conducted following the Closing.

4.2    Authorization and Binding Effect of Documents. Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly authorized and approved by all necessary corporate action on the part of Buyer. Buyer has the power and authority to execute, deliver and perform its obligations under this Agreement and each of the other Documents and to consummate the transactions hereby and thereby contemplated. This Agreement and each of the other Documents have been, or are at or prior to the Closing will be, duly executed by Buyer. The Documents, when executed and delivered by the parties hereto, will constitute the valid and legally binding agreement of Buyer, enforceable against Buyer in accordance with their terms, except as may be limited by bankruptcy, insolvency, or other similar laws affecting the enforcement of creditors' rights or remedies generally, and except as may be limited by general principles of equity.

4.3    Absence of Conflicts. Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents and the consummation by Buyer of the transaction contemplated hereby and thereby:

(a)    do not in any material respect (with or without the giving of notice or the passage of time or both) violate or result in the creation of any claim, lien, charge or encumbrance on any of the assets or properties of Buyer under any provision of law, rule or regulation or any order, judgment, injunction, decree or ruling applicable to Buyer in any manner which would have a material adverse effect on the assets, business, operation or financial condition or results of operations of Buyer;

(b)    do not (with or without the giving of notice or the passage of time or both) conflict with or result in a breach or termination of, or constitute a default or give rise to a right of termination or acceleration under, the articles of incorporation or bylaws of Buyer or any lease, agreement, commitment, or other instrument which Buyer is a party to, bound by, or by which any of its assets or properties may be bound, the results of which would be a Material Adverse Condition.

4.4    Governmental Consents and Consents of Third Parties. Buyer's execution and delivery of, and the performance of its obligations under, this Agreement and each of the other Documents and the consummation by Buyer of the transaction contemplated hereby and thereby, do not require the consent, waiver, approval, permit, license, clearance or authorization of, or any declaration or filing with, any court or public agency or other authority, or the consent of any Person under any agreement, arrangement or commitment of any nature to which Buyer is a party or by which it is bound, the failure of which to obtain would have a material adverse effect on the assets, business, operation or financial condition or results of operations of Buyer.

4.5    Broker's or Finder's Fees. No agent, broker, investment banker, or other Person or firm acting on behalf of or under the authority of Buyer or any affiliate of Buyer is or will be entitled to any broker's or finder's fee or any other commission or similar fee, directly or indirectly, from Seller in connection with transactions contemplated by this Agreement.

4.6     Litigation. There are no legal, administrative, arbitration or other proceedings or governmental investigations pending or, to the actual knowledge of Buyer, threatened against Buyer that would give any third party the right to enjoin the transactions contemplated by this Agreement.

4.7     Compliance with Patriot Act. Buyer is not nor will it become (i) a person whose property or interests in property are blocked pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) or (ii) a person or entity that knowingly engages in any dealings or transactions, or be otherwise knowingly associated, with any such person. Buyer is not in violation of the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act) Act of 2001.

4.8     Financial Capability and Ability to Bear Economic Risks. Buyer is not insolvent or bankrupt and, to its knowledge, is not aware of any the existence of action, threat, circumstance or event that will likely cause it to be insolvent or bankrupt, or otherwise unable to perform, through the end of its payment obligations to Sellers. Buyer represents that it has sufficient cash, liquid assets and/or credit so as to meet its payment obligations to Sellers as contemplated by this Agreement. The Buyer by reason of the business and financial experience of its management, has the capacity to protect its own interests in connection with the transactions contemplated by this Agreement and the other transaction documents. The Buyer is able to bear the economic risks of this transaction and is able to sustain a loss without economic hardship if such a loss should occur.

4.9     Buyer's Knowledge and Experience. The Buyer has had adequate opportunity to ask questions of, and receive answers from the Sellers, and the Seller's officers, employees, agents, accountants and representatives concerning the Business, operations, financial condition, assets, liabilities and all other matters relevant to Seller and the subject matter of this Agreement. As a result of its due diligence investigation, Buyer is knowledgeable about the Sale Assets and the Sellers and their operations, finances and Business. Buyer has such knowledge and experience in financial and business matters and specifically the specific business and operations of the Seller that Buyer is capable of evaluating the merits and risks of the contemplated transaction. Buyer has conducted its own due diligence with respect to the Sale Assets, Assumed Obligations, Sellers and the operations, finances and Business of Sellers, and any other matter that Buyer believes to be material to a decision to enter into this Agreement or ancillary agreements or commitment arising from the contemplated transactions.

ARTICLE V

TRANSACTIONS COVENANTS

5.1     Employment of Ryan Windsor. In consideration for the sale of the Sale Assets by Seller, Buyer agrees to employ Ryan Windsor at and following the Closing for up to twelve months pursuant to the form of Employment Agreement attached hereto as *Exhibit A*.

5.2     Domain Transfers. Seller and Buyer shall file with the applicable domain name registrars, within five business days after execution of this Agreement by the parties, such applications and other documents in the name of Seller or affiliated parties, as appropriate, as may be necessary or advisable to transfer ownership and registration rights in the Domain Names to Buyer. Seller and Buyer, at Buyer's expense, shall take all commercially reasonable steps necessary to prosecute such filings with diligence, to the end that the transfer to Buyer may be obtained as soon as practicable.

5.3     Tax Returns and Payments. All taxes pertaining to ownership of the Sale Assets or operation of the Seller's business prior to the Closing Date will be timely paid when due; provided that Seller shall not be required to pay any such tax so long as the validity thereof shall be contested in good faith by appropriate proceedings. In the event that any refund is received at or after the Closing Date by Buyer that pertain to the Sale Assets or operations of Seller's business prior to Closing Date, Buyer shall have set aside and immediately deliver to Ryan Windsor on behalf of Sellers any such tax refund amounts.

5.4     Confidentiality; Press Release.

(a)     The terms of this transaction shall be kept confidential by the parties. Notwithstanding the foregoing and nothing contained herein shall prohibit Buyer or Seller from supplying or filing such information to a valid governmental or court authority to the extent required by law or identifying this transaction and its material provisions to those customers, suppliers, creditors, litigation parties and/or government entities that have a need to know as a result of its arrangements with the Buyer or Seller.

(b)     Except as expressly permitted hereunder, no public announcement shall be made about this transaction without the consent of both parties hereto.

(c)     In the event that either party determines in good faith that a press release or other public announcement is desirable under any circumstances, the parties shall consult with each other to determine the appropriate timing, form and content of such release or announcement.

5.5     Reasonable Best Efforts. Subject to the terms and conditions of this Agreement, each of the parties hereto will use its reasonable best commercial efforts to take all action and to do all things necessary, proper or advisable to satisfy any condition to the parties' obligations hereunder in its power to satisfy and to consummate and make effective as soon as practicable the transactions contemplated by this Agreement.

5.6     Material Breach. Buyer agrees that, in the event Buyer fails to perform its obligations hereunder with respect to the assumption of liabilities, or any of them, such failure would constitute a material breach of this Agreement, which would entitle Seller to any all remedies available to it under the law and in equity, including (without limitation) the right to rescission of the Agreement or assignment back of the Sale Assets.

ARTICLE VI

CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER TO CLOSE

Buyer's obligation to close the transaction contemplated by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, unless waived by Buyer in writing:

6.1    Accuracy of Representations and Warranties.  The representations and warranties of Seller contained in this Agreement or in any other Document shall be complete and correct in all material respects on the Closing Date with the same effect as though made at such time except for changes that do not constitute a Material Adverse Condition on Buyer, the Seller's business, or the Sale Assets taken as a whole.

6.2    Performance of Agreements.  Seller shall have performed in all material respects all of its covenants, agreements and obligations required by this Agreement and each of the other Documents to be performed or complied with by it upon the Closing Date.

6.3    Adverse Proceedings. Neither Seller nor any affiliate of Seller shall be subject to any ruling, decree, order or injunction restraining, imposing material limitations on or prohibiting (i) the consummation of the transactions contemplated hereby or (ii) its participation in the operation, management, ownership or control of the Seller's business; and no litigation, proceeding or other action seeking to obtain any such ruling, decree, order or injunction shall be pending. No governmental authority having jurisdiction shall have notified any party to this Agreement that consummation of the transaction contemplated hereby would constitute a violation of the laws of the United States or of any state or political subdivision or that it intends to commence proceedings to restrain such consummation or to force divestiture, unless such governmental authority shall have withdrawn such notice. No governmental authority having jurisdiction shall have commenced any such proceeding.

6.4    Delivery of Closing Documents.  Seller shall have delivered or caused to be delivered to Buyer on the Closing Date each of the Documents required to be delivered pursuant to Section 8.2.

ARTICLE VII

CONDITIONS PRECEDENT OF THE OBLIGATION OF SELLER TO CLOSE

The obligation of Seller to close the transaction contemplated by this Agreement is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, unless waived by Seller in writing:

7.1    Accuracy of Representations and Warranties.  The representations and warranties of Buyer contained in this Agreement shall be complete and correct in all material respects on at the Closing Date with the same effect as though made at such time except for changes that are not materially adverse to Seller.

7.2     Performance of Agreements. Buyer shall have performed in all material respects all of its covenants, agreements and obligations required by this Agreement and each of the other Documents to be performed or complied with by it on the Closing Date.

7.3     Consents.

(a)     All authorizations, consents, approvals and clearances of all federal, state and local governmental agencies required to permit the consummation by Seller of the transactions contemplated by this Agreement shall have been obtained; all statutory and regulatory requirements for such consummation shall have been fulfilled; and no such authorizations, consents, approvals or clearances shall contain any conditions that individually or in the aggregate would have any material adverse effect on Seller.

7.4     Adverse Proceedings. Buyer shall not be subject to any ruling, decree, order or injunction restraining, imposing material limitations on or prohibiting: (i) the consummation of the transactions contemplated hereby or (ii) its participation in the operation, management, ownership or control of the Buyer's business; and no litigation, proceeding or other action seeking to obtain any such ruling, decree, order or injunction shall be pending. No governmental authority having jurisdiction shall have notified any party to this Agreement that consummation of the transactions contemplated hereby would constitute a violation of the laws of the United States or of any state or political subdivision or that it intends to commence proceedings to restrain such consummation or to force divestiture, unless such governmental authority shall have withdrawn such notice. No governmental authority having jurisdiction shall have commenced any such proceeding.

7.5     Delivery of Closing Documents and Purchase Price.  Buyer shall have delivered or caused to be delivered to Seller on the Closing Date each of the Documents required to be delivered pursuant to Section 8.3, and Buyer shall be ready, willing and able to deliver the Purchase Price in the form of payment set forth in this Agreement and its Exhibits and to assume and satisfy the Assumed Obligations set forth in Section 2.4.

## ARTICLE VIII

## CLOSING

8.1     Time and Place. Unless otherwise agreed to in advance by the parties, Closing shall take place at the offices of Seller or its counsel on the Closing Date.

8.2     Documents to be Delivered to Buyer by Seller. At the Closing, Seller shall deliver or cause to be delivered to Buyer the following:

(a)     Certified resolutions of Seller approving the execution and delivery of this Agreement and each of the other Documents and authorizing the consummation of the transactions contemplated hereby and thereby.

(b)     True and correct copies of the records described in Section 2.1(d) shall be

available at the offices of Seller.

8.3    Documents to be Delivered to Seller by Buyer. At the Closing, Buyer shall deliver or cause to be delivered to Seller the following:

(a)    Executed form of this Agreement and each of the other Documents.

(b)    The Purchase Price, in the form of a wire transfer.

## ARTICLE IX

## SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION

9.1    Survival of Representation and Warranties. All representations, warranties, covenants and agreements contained in this Agreement or in any other Document shall survive the Closing for the Survival Period and the Closing shall not be deemed a waiver by either party of the representations, warranties, covenants or agreements of the other party contained herein or in any other Document. No claim may be brought under this Agreement or any other Document unless written notice describing in reasonable detail the nature and basis of such claim is given on or prior to the last day of the Survival Period. In the event such a notice is so given, the right to indemnification with respect thereto under this Article shall survive the Survival Period until such claim is finally resolved and any obligations with respect thereto are fully satisfied. For purposes of this agreement the "Survival Period" shall be twelve (12) months after the Closing Date, except that any representation or warranty of Buyer or Seller as to (i) such party's qualification and authority to consummate the transactions contemplated hereby, (ii) title of the parties to the Sale Assets, (iii) any tax obligation of Seller, or (v) Section 3.7 (Litigation), the Survival Period shall be twenty-four (24) months.

9.2    Indemnification in General. Buyer and Seller agree that the rights to indemnification and to be held harmless set forth in this Agreement shall, as between the parties hereto and their respective successors and assigns, be exclusive of all rights to indemnification and to be held harmless that such party (or its successors or assigns) would otherwise have by statute, common law or otherwise. Except with regard to actual fraud or intentional misrepresentation in connection with the transaction described herein, each party's rights under this Article shall be the sole and exclusive remedies with respect to claims resulting from or relating to any misrepresentation, breach of warranty or failure to perform any covenant or agreement contained in this Agreement or otherwise relating to the transactions that are the subject of this Agreement. Without limiting the generality of the foregoing, in no event shall either party or any Person claiming through, by or on behalf of either party, be entitled to claim or seek rescission of the transactions consummated under this Agreement.

9.3    Indemnification by Seller.

(a)    Subject to the provisions of Section 9.3(b) below, Seller shall indemnify

and hold harmless Buyer and any officer, director, agent, employee and affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including reasonable attorneys' fees), relating to or arising out of:

(i)  Any breach or non-performance by Seller of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Documents through the Survival Period;

(ii)  The ownership or operation by Seller of the Sale Assets on or prior to the Closing Date, other than the Assumed Obligations; or

(iii) All other liabilities and obligations of Seller other than the Assumed Obligations.

(b)  Except for any amounts owed by Seller to Buyer under Section 9.3(a)(iv), and Section 2.7, if Closing occurs, Seller shall not be obligated until the amount of such claims, liabilities, damages, losses, costs and expenses exceeds Buyer's Threshold Limitation, in which case Buyer shall then be entitled to indemnification of the entire amount.

9.4    Indemnification by Buyer.

(a)  Subject to the provisions of Section 9.4(b) below, Buyer shall indemnify and hold harmless Seller and any officer, director, agent, employee and affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, affiliate thereof with respect to any and all demands, claims, actions, suits, proceedings, assessments, judgments, costs, losses, damages, liabilities and expenses (including reasonable attorneys' fees) relating to or arising out of:

(i)  Any breach or non-performance by Buyer of any of its representations, warranties, covenants or agreements set forth in this Agreement or any other Document;

(ii)  The ownership or operation of the Seller's business and/or the use of the Sale Assets after the Closing Date; or

(iii)  All other liabilities or obligations of Buyer pursuant to the terms of this Agreement, including, without limitation, the Assumed Obligations.

(b)  Except for any amounts owed by Buyer to Seller or Rodney Smith and the performance of the Assumed Obligations, if Closing occurs, Buyer shall not be obligated until the amount of such claims, liabilities, damages, losses, costs and expenses exceeds Seller's Threshold Limitation, in which case Seller shall then be entitled to indemnification of the entire amount.

(c)  In addition to, and not in lieu of the remedies otherwise provided herein with regard to indemnification from Buyer, in the event that a Bankruptcy Event applies to Buyer

prior to its successfully and fully satisfying its obligations to Sellers with regard to the Assumed Obligations (Section 2.3) or Payment of Purchase Price (Section 2.4), then Seller may exercise its rights, including (without limitation) with regard to a Material Breach per Section 5.6.

9.5     Indemnification Procedures. In the event that an Indemnified Party may be entitled to indemnification hereunder with respect to any asserted claim of, or obligation or liability to, any third party, such party shall notify the Indemnifying Party thereof, describing the matters involved in reasonable detail, and the Indemnifying Party shall be entitled to assume the defense thereof upon written notice to the Indemnified Party with counsel reasonably satisfactory to the Indemnified Party; provided, that once the defense thereof is assumed by the Indemnifying Party, the Indemnifying Party shall keep the Indemnified Party advised of all developments in the defense thereof and any related litigation, and the Indemnified Party shall be entitled at all times to participate in the defense thereof at its own expense. If the Indemnifying Party fails to notify the Indemnified Party of its election to defend, or contests its obligation to indemnify under this Article IX, the Indemnified Party may pay, compromise, or defend such a claim without prejudice to any right it may have hereunder.

## ARTICLE X

## MISCELLANEOUS

10.1   Further Actions. From time to time before, at and after the Closing, each party, at its expense and without further consideration unless otherwise specified herein, will execute and deliver such documents to the other party as the other party may reasonably request in order more effectively to consummate the transactions contemplated hereby.

10.2   Access After the Closing Date. After the Closing and for a period of the longer of: (i) twelve (12) months, and (ii) such reasonable period of time as Seller may require in order to defend or prosecute any litigation, investigation, liability or claim involving the Business, Assumed Liabilities, Sale Assets or subject matter of this Agreement, Buyer shall provide Seller, Seller's counsel, accountants and other representatives with reasonable access during normal business hours to the books, records, property, personnel, contracts, commitments and documents of Buyer pertaining to the Sale Assets, Assumed Obligations, Business or transactions occurring prior to, at or after the Closing Date that are the responsibility and obligation of the Seller, when requested by Seller, and Buyer shall retain such books and records for the normal document retention period of Buyer. At the request and reasonable expense of Seller, Buyer shall deliver copies of any such books and records to Seller.

10.3   Payment of Expenses.

(a)     Any fees assessed for the transfer and/or renewal of the Domain Names shall be the responsibility of Buyer.

(b)     All state or local sales or use, stamp or transfer, grant and other similar taxes payable in connection with consummation of the transactions contemplated

hereby shall be shared equally between Seller and Buyer.

(c)     Except as otherwise expressly provided in this Agreement, each of the parties shall bear its own expenses, including the fees of any attorneys and accountants engaged by such party, in connection with this Agreement and the consummation of the transactions contemplated herein.

10.4   Notices. All notices, demands or other communications given hereunder  shall be in writing and shall be sufficiently given if delivered by courier or sent by registered or certified mail, first class, postage prepaid, or by facsimile machine or similar written means of communication, addressed as follows:

(a)     If to Seller, to:

Cwiss Holdings LP
555 East 5th Street, #2811
Austin, TX
Attention:     Ryan Windsor
Telephone:    (415) 717-8978
Email:          ryan@swiss.com

With a copy to:

Taylor English Duma LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
Attention:     Henry Quillian, Esq.
Telephone:    (770) 434-6868
Email:          hquillian@taylorenglish.com

(b)     If to Buyer, to:

Tom Schmidt
Schmidt Law Firm, PLLC
7880 San Felipe, Suite 210
Houston, Texas 77063
Telephone: (713) 568-4899
Email:          tom@schmidtfirm.com

or such other address with respect to any party hereto as such party may from time to time notify (as provided above) to the other party hereto. Any such notice, demand or communication shall be deemed to have been given (i) if so mailed, as of the close of the third (3rd) business day following the date mailed, and (ii) if personally delivered or otherwise sent as provided above, on the date received. A copy of any notice sent shall be provided by email at the above specified email address, although the delivery of such email shall not constitute notice for the purposes of

this Agreement.

10.5  Entire Agreement. This Agreement, the Schedules and Exhibits hereto, and the other Documents constitute the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede any prior negotiations, agreements, understandings or arrangements between the parties with respect to the subject matter hereof.

10.6  Binding Effect; Benefits. Except as otherwise provided herein, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors or assigns. Except to the extent specified herein, nothing in this Agreement, express or implied, shall confer on any Person other than the parties hereto and their respective successors or assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement.

10.7  Assignment. This Agreement and any rights hereunder shall not be assignable by either party hereto without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Buyer may in its sole and absolute discretion, assign all of its right, title, interest  and obligation under this Agreement to any entity controlled by, or under common control with Buyer; provided, however, that each such assignor and assignee shall be jointly and severally liable for Buyer's obligations hereunder.

10.8  Governing Law. This Agreement shall in all respects be governed by and construed in accordance with the laws of the State of Texas, including all matters of construction, validity and performance.

10.9  Bulk Sales. Buyer hereby waives compliance by Seller with the provisions of the Bulk Sales Act and similar laws of any state or jurisdiction, if applicable.

10.10 Amendments and Waivers. No term or provision of this Agreement may be amended, waived, discharged or terminated orally but only by an instrument in writing signed by the party against whom the enforcement of such amendment, waiver, discharge or termination is sought. Any waiver shall be effective only in accordance with its express terms and conditions.

10.11 Severability. If any provision of this Agreement, or the application thereof to any Person or entity or any circumstance, is invalid or unenforceable in any jurisdiction, (i) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the extent and purpose of such invalid and unenforceable provision, and (ii) the remainder of this Agreement and the application of such provision to other Persons, entities or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

10.12 Headings. Except as provided in Article I, the captions in this Agreement are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

10.13 Counterparts. This Agreement may be executed in any number of counterparts, and

by either party on separate counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Fax signatures shall be deemed the same as original signatures. This Agreement is not binding until executed by both parties hereto.

10.14 References. All references in this Agreement to Articles and Sections are to Articles and Sections contained in this Agreement unless a different document is expressly specified.

10.15 Schedules and Exhibits.  Unless otherwise specified herein, each Schedule and Exhibit referred to in this Agreement is attached hereto, and each such Schedule and Exhibit is hereby incorporated by reference and made a part hereof as if fully set forth herein.

10.16 Attorneys' Fees. If any action at law or equity is brought, whether in a judicial proceeding or arbitration, to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and expenses from the other party, which fees and expenses shall be in addition to any other relief, which may be awarded.

10.17 Knowledge. All references to the knowledge or awareness of Seller or Buyer shall refer to the Seller's or Buyer's respective actual knowledge, assuming a reasonable degree of investigation by such party in the ordinary course of its business.

*Signatures appear on following page.*

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first written.

"SELLER":                                    "BUYER":

CWISS HOLDINGS LP                            CITY INFO EXPERTS, LLC

By: _____               By: _____

Name: _____               Name: C. Thomas Schmidt

Title: _____               Title: CEO + Manager

SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT

## LIST OF SCHEDULES

Schedule 2.1(a)            List of Domain Names

Schedule 2.1(c)            Trade names, Trademarks & Logos

Schedule 2.3               List of additional liabilities assumed by Buyer

Schedule 3.10              Compliance with Law

These Schedules are not intended to constitute, and shall not be construed as constituting, any representation or warranty of Seller except as and to the extent expressly provided in the Agreement. The fact that any item of info1mation is contained herein shall not, in and of itself, be construed to mean that such information is required to be disclosed in or by the Agreement or that such item of information is "material" as such term is used in the Agreement.

Seller has not undertaken to describe the contents of documents referred to in these Schedules. Instead, references to such documents are qualified in their entirety by the text of such documents. Furthermore, the reference to any document is deemed to include any and all exhibits, schedules, annexes and other attachments to such document.

Any matter disclosed in one Schedule hereof in such a way as to make its relevance to information called for by another Schedule readily apparent shall be deemed to be disclosed in such other Schedules, notwithstanding the omission of an appropriate cross-reference. The headings in these Schedules are for convenience of reference only and shall not be deemed to alter or affect the express description of the sections of these Schedules as set forth in the Agreement.

EXHIBIT A

Employment Agreement for Ryan Windsor – See separate attachment.

# EXHIBIT C

July 8, 2015

Ryan Windsor
555 East 5th Street, #2811
Austin, TX 78701

      RE: Your Employment with City Info Experts, LLC

Dear Mr. Windsor:

This letter confirms our understandings related to your employment as President of the Internet Sales Division of City Info Experts, LLC ("CIE"), a Texas Limited Liability Company that is acquiring the Sale Assets and agreeing to perform the Assumed Obligations from Alcatraz Media, Inc. ("Alcatraz") pursuant to that certain Asset Purchase Agreement by and between Alcatraz and CIE. During your employment with CIE, the following terms and conditions shall apply, which will be further memorialized in membership agreement with regard to the equity, or other appropriate contracts with CIE as necessary and typical to memorialize such arrangement:

1) Your employment with the CIE starts at the later to occur of the date following your signing of this document, the Closing of the Asset Purchase Agreement with Alcatraz, or such other date as you and CIE may agree. The term of your employment shall be for a minimum of one (1) year and may be renewed or extend for one year terms upon mutual acceptance. During such period of your employment by CIE, you will be available during regular work weeks to work for thirty (30) hours, exclusive of CIE holidays and PTO.

2) Your work responsibilities will be to manage the Internet sales of CIE and to manage, in conjunction with the CEO, the employees of CIE. Additional or different duties may be assigned by the Company or its Board of Managers as reasonably acceptable to you.

3) You will be paid a base annual salary of $100,000, which amount shall be payable in equal installments through regular payroll that is to occur at least monthly. The then-current base salary shall be guaranteed for the term, and will be paid to you through the end of that term provided that you do not terminate your employment from CIE or are not terminated for cause by the CIE during such term. An increase to then-current annual base salary will have to be approved by CIE.

4) For any year that you are employed by the CIE, You will receive year-end bonuses as follows:

    i. $50,000 in each year in which the Internet Sales Division generates at least $100,000 of net income on a GAAP basis.

    ii. An additional $50,000 in each year in which the Internet Sales Division generates at least $200,000 of net income on a GAAP basis.

EXHIBIT C - Page 1 of 4

iii. An additional $75,000 in each year in which the Internet Sales Division generates at least $750,000 of net income on a GAAP basis.

iv. An additional $100,000 in each year in which the Internet Sales Division generates at least $1,500,000 of net income on a GAAP basis.

v. An additional annual bonus to Windsor of $100,000 in each year in which the Internet Sales Division generates above $2,000,000 of net income.

For the purposes of the above bonus targets, "net income" shall be calculated as revenues, minus expenses, minus payments made to American Express in connection with the Assumed Amex Liability. CIE, in its sole discretion, may award you an additional annual bonus based on your individual performance as well as the financial performance of CIE.

5) You will receive (with CIE paying the cost of the premium) the following benefits to the extent they are made generally available to personnel of CIE: (i) health, dental, prescription drug and vision coverage for you and your immediately family; (ii) group life insurance; and (iii) short-term and long-term disability insurance. You will also have paid time off (PTO) for CIE holidays plus up to three (3) weeks per year for vacation, personal time, or sick time.

6) CIE shall provide you with, and cover the expense of you using, office space at CIE's Atlanta office, a cell phone with data service, a laptop computer and other necessary facilities, equipment and applications for the conduct of the business. Your work will be performed in such reasonable location as you choose, among Austin, TX, San Francisco, CA or any other location as you and CIE agree to in advance. You shall not be required to re-locate your personal residence from the general area of such location; however, in the event that you ever agree to relocate your personal residence in order to accommodate CIE, CIE shall pay all costs associated with you relocating you, your home and your office to the new location.

7) CIE shall provide you a severance package that shall be payable in the event that your employment is terminated without cause or you resign for Good Reason. If your employment is terminated without cause or you resign for Good Reason, severance will include (i) payment to you of any remaining amounts of your annual base salary; (ii) immediate payment to you of all amounts due you but not yet paid; and (iii) continued payment by CIE of the costs of all bonuses and benefits listed herein for the then-current employment term. If you resign from CIE for other than Good Reason, you will not be eligible for severance. "Good Reason" shall mean that there is (i) any material change in your title, position, responsibilities or authority, with which you did not agree in writing, (ii) any change in control of CIE, or (iii) the business capitalization or annual revenue of CIE does not exceed $1 million within twelve months of you first being employed.

"Cause" shall mean your:

(a)   willful or gross failure or refusal to perform, or any willful or gross misconduct in the performance of any significant portion of his obligations, duties and responsibilities under this Agreement, which

EXHIBIT C - Page 2 of 4

(i) is incapable of cure, or (ii) has not been cured or remedied as promptly as reasonably possible (and in any event within seven (7) days) after written notice from the Company to you specifying in reasonable detail the nature of such failure, refusal or misconduct, or

(b) material breach of the provisions of paragraphs 11, which (i) is incapable of cure, or (ii) has not been cured or remedied promptly (and in any event within thirty (30) days) after written notice from the Company to Employee specifying in reasonable detail the nature of such breach, or

(c) act or acts of dishonesty in connection with his employment, or

(d) commission of a crime involving moral turpitude or which otherwise materially and adversely affects Company or its business or reputation.

8) Regarding any expenses that you may incur in the performance of your duties or the furtherance of the business of CIE, including those associated with entertaining and travel, CIE will reimburse you within 10 days upon receipt of an expense report, provided that any expenses in excess of $25.00 must be approved in writing by CIE in advance.

9) Upon the execution of this document and Closing of the Asset Purchase Agreement with Alcatraz, you will be issued such number of Restricted Shares / Membership Units in CIE with a value of $150,000 based upon the fair market value of CIE as of the date you sign this document. On both the one-year and two-year anniversaries of your employment start date, provided you are still employed by CIE, you shall be issued additional Restricted Shares in CIE with a value of $150,000 at the time of such anniversary. The Restricted Shares shall vest in 33.33% increments per year, over a three-year period, so long as you are not terminated for Cause nor resign other than for Good Reason. Notwithstanding the foregoing, in the event of a likely change of control of the CIE, or the likely sale of substantially all of the assets of the CIE, all Restricted Shares that have not yet been issued shall be immediately issued to you just prior to, or contemporaneously with, such event.

10) CIE agrees to negotiate with American Express Travel Related Services, Inc. or its assigns or affiliates to resolve all of Alcatraz's debt to American Express for credit card charges and other amounts and all of your obligations and responsibilities to guaranty the repayment of such debt (the "Assumed Amex Liability"). CIE agrees to hold harmless, defend and indemnify you against any liability, cost and expense that you may owe or have regarding such debt. CIE also agrees to hold harmless, defend and indemnify you against any liability, cost and expense that you may personally owe or have regarding the obligations and liabilities of Alcatraz or its owners, directors, managers or employee arising from or relating the litigation presently pending between Sellers and RLCL Acquisitions, LLC (d/b/a Gray Line of Tennessee) in the State Court of Gwinnett County, GA (See Schedule 3.7(i) of Asset Purchase Agreement). The obligations of this Section 9 shall survive any termination of your employment.

EXHIBIT C - Page 3 of 4

11) During the term of your employment by CIE and for a period that is the longer of (i) five (5) years from the Closing Date of the Asset Purchase Agreement with Alcatraz provided that CIE timely and successfully fulfills its obligations per such agreement, and (ii) thirty-six (36) months following the termination of employment by CIE that occurs either for cause or by you for any reason other than Good Reason (the "Confidentiality Period"), you shall not, within the United States, either directly or indirectly, perform or undertake any duty or responsibility substantially similar to any duty or responsibility you performed for the CIE in the service of or on behalf of any person, firm, partnership, corporation or unincorporated association or entity of any kind that is engaged in activities that are directly competitive with the Business of CIE as acquired from Alcatraz. During the Confidentiality Period, you shall not use for personal benefit and shall use reasonable best efforts to keep confidential all confidential, non-public information of CIE, Alcatraz Media, Inc., ZZ, Inc., Cwiss Holdings, LLC, and their affiliates.

We look forward to working together to start this new opportunity together. This arrangement shall constitute an agreement and shall be governed and controlled in all respects by the laws of the State of Georgia, including interpretation, enforceability, validity, and construction, without regard to any conflict of law provisions. Venue for any dispute arising in connection with this Agreement shall be in the state or federal courts located in Cobb County, Georgia, with you and CIE consenting to such venue and waive any defense that such forum is improper or inconvenient. If you are in agreement with the above stated arrangement, please indicate your acceptance by signing below where indicated.

Sincerely,

City Info Experts, LLC

By: _____

C. Thomas Schmidt
Manager

Acceptance by:

_____

Ryan Windsor

_____

Date

EXHIBIT C - Page 4 of 4